75 N.J. Super. 283 (1962)
183 A.2d 118
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT BERKO, DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT GUDGER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 1962.
Decided June 26, 1962.
*286 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Herman J. Ziegler argued the cause for appellant Robert Berko.
Mr. A. Donald McKenzie argued the cause for appellant Robert Gudger (Messrs. McKenzie & Hehl, attorneys; Mr. McKenzie, of counsel and on the brief).
Mr. Solomon Lautman, Assistant Prosecutor, argued the cause for respondent (Mr. Vincent P. Keuper, Monmouth County Prosecutor, attorney; Mr. Lautman, of counsel and on the brief).
*287 The opinion of the court was delivered by FREUND, J.A.D.
Defendants Robert Berko and Robert Gudger were indicted on two counts for uttering "false, forged and counterfeited" checks on July 30, 1960, in violation of N.J.S. 2A:109-1, and aiding and abetting each other in so doing, N.J.S. 2A:85-14. They were found guilty after a jury trial and sentenced to a term of two to four years at State Prison on each count, the sentences to run concurrently. They appealed their convictions.
The essential facts developed on the State's case came from four witnesses. Defendants did not testify, nor did they offer testimony of any witnesses.
Dorothy Cizon, a secretary in the Bayway office of the National State Bank in Elizabeth, N.J., testified that she interviewed both defendants when they came to the bank on Friday, July 15, 1960, at 2:25 P.M., to open a checking account. She prepared a new account memo from information given to her by defendants. The memo discloses the account was to be in the name of National Fire Alarm Rental Service (National) of 112 E. 2nd Avenue, Roselle, N.J. It identified James Noonan of 28 Schley Street, Newark, N.J. as president of National, and Gudger as its secretary. The account was opened with a check for $100 drawn on a Maplewood, N.J. bank. Because the account was opened late in the day, that check was not processed until the following Monday, July 18. On July 26 the check for the initial deposit was returned for insufficient funds, leaving the account without a balance.
Miss Cizon testified that Gudger represented himself as being Noonan and signed the signature identification card with Noonan's name. The defendants completed a corporate resolution in her presence with the signatures of Noonan and Gudger affixed as president and secretary of the corporation, respectively, and certified as their "authentic official signatures." (How the resolution could have been completed in this fashion  with Gudger's and "Noonan's" signatures *288  in the presence of a presumably responsible bank employee is not explained.) The bank prepared a checkbook for the use of National. Printed on the face of the checks were National's name, its address, telephone number, and the word "payroll." The checkbook was held at the bank, where it presumably arrived between July 25 and 28. Miss Cizon was unable to state the exact date when the checkbook was "picked up."
Mary Steinberger, an employee in the credit department of Montgomery Ward in Eatontown, N.J., was the next witness. She testified that on Saturday, July 2, 1960, Gudger came to her with a check made to his order, signed by Berko, and asked if he could have it cashed. She took the check and Gudger's driver's license to Mr. McKenzie, the operating manager of the store, who refused to approve cashing it "because it was a second party check and * * * identification of the signing party was necessary." Gudger then told her the check had been signed by his "boss" who was out in the main part of the store. He left and soon returned with Berko. Defendants were then taken to McKenzie's office.
The following Saturday, July 9, defendants again came to Mrs. Steinberger, this time with two checks to be cashed, and she sent them to McKenzie. She disclaimed knowledge as to whether the checks on either of these dates were cashed.
Defendants returned to the Montgomery Ward store the next Saturday, July 16. McKenzie was on vacation, and Mrs. Steinberger took their checks and identification to Mr. McGee, the auditor, who approved them. Although her testimony is unclear as to what occurred on the following Saturday, July 23, it would appear that defendants may have again cashed checks in her presence that day.
Finally, on Saturday, July 30, defendants brought two National payroll checks to her. These are the alleged forged instruments. Being satisfied with the previous identification of defendants, she approved the checks for payment. Gudger's check was to his order for $129.01; the other *289 check was to the order of Berko for $127.03. Photographic copies of these checks, marked as exhibits, show that they were signed by "James Noonan," and the amounts payable were filled in by a check writing machine.
We note here that the checks presented on the Saturday before July 30 were personal and not corporate checks, in amounts of less than $100. Mrs. Steinberger testified that to her knowledge these checks had not been dishonored.
Joseph E. Freda, assistant cashier at the same office as Miss Cizon, corroborated her testimony that National's account was opened on July 18 with the $100 deposit. The bank statement shows that on July 26 $100 was charged against the account, thereby reducing National's balance to zero. The bank records disclose that on August 1 a deposit of $530 was credited to National's account. On August 3 there were presented for payment 13 checks varying in amounts between $126 and $129. The bank paid four checks, while nine were returned for insufficient funds. A nominal balance remained in the account and was later appropriated by the bank for service charges.
Freda's testimony was that National's account had been closed automatically on July 26 when there was a zero balance. The fact remains, however, that the $530 check was accepted for deposit, under the same account number and without formally reopening the account. Moreover, it was not until August 3 that the bank's tellers were instructed not to accept any further deposits on National's account.
The last witness was Philip Delano, a police officer of Millburn, N.J. His testimony did not directly relate to the two checks.
Defendants presented no evidence or witnesses. Neither the prosecution nor the defense offered any proof as to Noonan's whereabouts.
The full text of the forgery statute under which defendants were convicted reads as follows:
"Any person who, with intent to prejudice, injure, damage or defraud any other person:
*290 a. Falsely makes, alters, forges or counterfeits any record or other authentic matter of a public nature or character, or any printed or written instrument or indorsement, acceptance, transfer or assignment thereof; or
b. Utters or publishes as true, any such false, altered, forged or counterfeited matter, knowing the same to be false, altered, forged or counterfeited 
Is guilty of a high misdemeanor." N.J.S. 2A:109-1. It follows that, whatever may have been defendants' intent or knowledge in negotiating the two checks at Montgomery Ward on July 30, they could not be convicted of violating N.J.S. 2A:109-1 unless, in the words of the indictments, the checks were "false, forged and counterfeited."
Forgery has generally been defined as the "false making or materially altering, with intent to defraud, of any writing, which, if genuine, might apparently be of legal efficacy, or the foundation of legal liability." Hubsch v. United States, 256 F.2d 820, 823 (5 Cir. 1958); 23 Am. Jur., Forgery (1939), § 2, p. 676. Forgery "may be committed in any writing, which, if genuine, would operate as the foundation of another's liability or the evidence of his right." 3 Underhill, Criminal Evidence (5th ed. 1957), § 770, p. 1769. In Rohr v. State, 60 N.J.L. 576, 579 (E. & A. 1897), the court considered the antecedent of N.J.S. 2A:109-1 and, in examining the statutory phrase "to falsely make, alter, forge, or counterfeit," noted that "falsely" as used in the statute implies that the paper or writing is "not genuine, fictitious, not a true writing." (Emphasis added.)
Forgery has also been said to have a "broad" as well as a "narrow" definition with respect to the use of a fictitious or assumed name. The broad definition applies in a majority of jurisdictions, where it is settled that forgery may be committed by executing, or procuring to be executed, a written instrument in a fictitious or assumed name with intent to defraud. Annotation, "Forgery: use of fictitious or assumed name," 49 A.L.R.2d 852 (1956) (cases supporting this rule are cited at pp. 856-863). The *291 broad definition has been adopted by New Jersey. State v. Ruggiero, 43 N.J. Super. 156, 159 (App. Div. 1956), affirmed 25 N.J. 292 (1957); 2 A.L.R.2d Supplement Service (1960), p. 3192. The narrow definition states that forgery is committed when one, with intent to defraud, falsely makes or alters an instrument in writing so as to make it appear that such an instrument is that of one other than the person actually making it. Green v. State, 76 So.2d 645, 49 A.L.R.2d 847, 850 (Fla. Sup. Ct. 1954); Annotation, 49 A.L.R.2d, supra, at p. 863 for cases supporting this rule.
Clearly, these authorities dispel the possibility that Berko or Gudger were forgers within the meaning of the statute if the two checks were in fact genuine, although the instruments were worthless. This conclusion is supported by Goucher v. State, 113 Neb. 352, 204 N.W. 967, 41 A.L.R. 227 (Sup. Ct. 1925), where the court, interpreting a statute similar to N.J.S. 2A:109-1, stated:
"The genuine making of a false instrument is not generally a forgery, and this is the usual interpretation of the courts, unless otherwise provided in the statutes themselves. The decisions are nearly unanimous that the making of a false instrument is not within a criminal statute directed against the false making of an instrument. [cases] This is not a mere play on words. It is a substantive distinction by which even a knave is protected in prosecutions under legislative enactments authorizing punishments for different species of fraudulent acts such as forgery, obtaining money by false pretenses, larceny and embezzlement. Statutes like the one under consideration are generally considered to be forgery statutes. There is a distinction between forgery and obtaining property by a false writing. [cases] The essence of forgery is the making of a false writing with the intent that it shall be received as the act of another than the party signing it. [cases] Forgery cannot be committed by the making of a genuine instrument, though the statements made therein are untrue. * * *
A check bearing the genuine signature of the maker, though drawn on a bank in which the maker has no money or credit, with the intention of cheating the payee or the bank, is not a forgery."
Thus the immediate issue becomes whether the State offered sufficient proof to have presented a jury question *292 that the two checks were "not genuine  fictitious, not a true writing." We first conclude as a matter of law, notwithstanding Freda's testimony to the contrary, that National did have an account at the bank on the day the two checks were presented by Montgomery Ward for payment. The bank's treatment of National's account up to August 3 does not support his testimony that the account had been closed out. Nevertheless, the mere fact that National did have a bank account (it should be recalled that $530 was on deposit the day the numerous checks arrived) would not protect Berko and Gudger from conviction under N.J.S. 2A:109-1 if National, the drawer of the checks, was a fictitious person. In this respect see the statement of the "broad definition" of forgery, through use of a fictitious name, in State v. Ruggiero, supra, 43 N.J. Super., at p. 159, 128 A.2d 7.
Next, and of cardinal importance, we observe that there was no evidence presented by the State to indicate that National was other than what it appeared to be  a bona fide corporation organized and existing under the laws of New Jersey. The State made no effort to show that National had not been duly incorporated, or, if organized, that it had been dissolved or had forfeited its charter. Nor was there any other evidence from which the jury could have concluded that National was neither a de facto nor a de jure corporation. The State was not required to prove beyond a reasonable doubt that there was no such New Jersey corporation as National, State v. Barnhart, 127 W. Va. 545, 33 S.E.2d 857, 859 (Sup. Ct. App. 1945); People v. Gordon, 13 Cal. App. 678, 110 P. 469 (Ct. App. 1910); it was only necessary to show "to a common certainty" that there was no such corporation. People v. Gordon, supra, 110 P.2d, at p. 472 (emphasis added); State v. Wellard, 3 Utah 2d 129, 279 P.2d 914, 916 (Sup. Ct. 1955).
In State v. Wellard, supra, 279 P.2d, at p. 917, the court was also concerned with a forgery statute similar to ours. The question presented there was whether one Frank *293 Adams, the purported maker of the check, was a fictitious person. Evidence was presented that the drawee bank had no account in Adams' name, and that the handwriting on the face of the check and the name appended thereto appeared to be defendant's. These factors, with others bearing on Adams' nonexistence, led to an affirmance of defendant's conviction since they satisfied the requirement that there be some "proof" showing "there was no such person as the purported maker in the vicinity of Davis County, Utah, who was connected with the acts charged in the information."
By presenting no relevant evidence on the question of whether National was a genuine or bona fide corporation, the State failed to prove that National was a fictitious person, thus invoking the Ruggiero rule. Any evidence the State would have offered which would show or tend to show the existence or nonexistence of the allegedly fictitious person would have been relevant and admissible. State v. Barnhart, supra, 33 S.E.2d, at p. 859; 3 Underhill, supra, § 778, pp. 1784-6.
For example, the results of a search of the Secretary of State's records listing certificates of corporations, which by statute he is required to record, would have been admissible. R.S. 14:1-4. Likewise, testimony by residents at or near National's address that they did not know of any such corporation, as well as the result of inquiries made thereabouts or of any diligent search, would have been admissible to show the corporation's nonexistence. Coward v. State, 223 Miss. 538, 78 So.2d 605, 609 (Sup. Ct. 1955); Mathis v. State, 121 Tex. Crim. 131, 50 S.W.2d 312 (Crim. App. 1932) where the court ruled that, "The state may resort to legitimate circumstances to prove that the person is fictitious."
In the light of the authorities, we conclude that the State has failed to demonstrate that National was a fictitious or non-genuine person. National's checks, therefore, which were prepared in accordance with the signature *294 identification card filed with the bank, have not been proved to be other than genuine. Accordingly, the record is barren of any proof that the checks were false within the meaning of N.J.S. 2A:109-1. Since no conviction for forgery can stand unless the State has proven a false or forged instrument, the convictions must be set aside. There being an absence of proof that either defendant committed the offense with which he was charged, it necessarily follows that neither of them could be found guilty of aiding and abetting the other in committing forgery.
As regards the possibility of Noonan's being a fictitious person, suffice it to say that Noonan was not the maker of either check. By the terms of the corporate resolution, Noonan was only authorized to sign "on behalf of" National as president. Moreover, the signature on the bank's signature identification card and corporate resolution were the same as on the two checks, and four other checks signed by Noonan were admittedly paid by the bank on August 3.
Although the principles enunciated in State v. Ruggiero, supra, might have applied to this case, if sufficient evidence had been offered, Ruggiero is distinguishable since defendant acknowledged that the check he uttered was that of a nonexistent person, and was false and ungenuine. The genuineness of the checks negotiated here has not been legally and evidentially disproved.
In view of our disposition of this appeal it becomes unnecessary to discuss the several other grounds for reversal urged by defendants. However, we do point out that the testimony of officer Delano was so brief and incomplete regarding the search of the automobile used by one of the defendants that it does not permit any evaluation or disposition on the merits as to the reasonableness of the search. Indeed, it is not clear that the testimony of this witness was based upon a search or whether it was merely a recital of what he was able to see from outside the vehicle.
Reversed.