**LIBERTY NATIONAL BANK, Plaintiff,**

v.

**AETNA LIFE & CASUALTY COMPANY, Defendant.**

Civ. A. No. 78–1843.

United States District Court, D. New Jersey.

June 24, 1983.

Sills, Beck, Cummis, Zuckerman, Radin & Tischman by Lee Alan Adlerstein, Newark, N.J., for plaintiff.

Lum, Biunno & Tompkins by Roger P. Sauer, Newark, N.J., for defendant.

## OPINION

SAROKIN, District Judge.

In this diversity action, Liberty National Bank ("the Bank"), a New Jersey corporation, seeks recovery under a Bankers Blanket Bond ("the Bond") issued by Aetna Life & Casualty Company ("Aetna"), a corporation incorporated under the laws of the State of Connecticut. In 1976 the Bank made a demand loan in the amount of $112,500 to Edward M. Vaughn and a similar loan in the amount of $112,000 to his mother, Ruth D. Martin. The loans were secured by certificates of deposit ("the CDs") purportedly issued by the National Bank of Commerce, LTD., ("NBC"), an entity which had been chartered as a bank in St. Vincent, British West Indies, but which had no assets. The loans were never repaid and the CDs proved to be worthless.

The Bank made a timely claim of loss to Aetna which denied coverage. The Bank instituted an action in the Superior Court of New Jersey, Law Division, Bergen County, which was removed to this court on August 2, 1978. The jurisdiction of the court arises pursuant to 28 U.S.C. §§ 1332, 1441, 1446. The action was stayed pending final disposition of a separate state court action by the Bank against Mr. Vaughn and Mrs. Martin on the demand notes. After entry of final judgment in the state court action, the matter was reinstated. A related federal criminal action against Mr. Vaughn for fraudulently misrepresenting the value of securities in violation of 18 U.S.C. § 1014 resulted in a guilty verdict, which has been affirmed by the Third Circuit Court of Appeals.

Section 2(e) of the Bond provides in pertinent part:

Section 2. THIS BOND DOES NOT COVER:

. . . . .

(e) loss resulting from the complete or partial nonpayment of, or default upon,

(1) any loan, or transaction in the nature of, or amounting to, a loan made by or obtained from the Insured . . .

whether procured in good faith or through trick, artifice, fraud or false pretenses unless such loss is covered under Insuring Agreement (A), (D) or (E); . . .

(See Exhibit A to Affidavit of Donald Simpson dated November 19, 1982, hereafter "Simpson Affidavit"). The parties do not dispute that this loan exclusion clause is

generally applicable to these transactions. The issue is whether the Bank can prove its right to recover under one of the enumerated Insuring Agreements.

The Bank now moves for partial summary judgment with regard to its right to recover under Insuring Agreements D and E; Aetna has cross-moved for partial summary judgment to deny recovery to the Bank under Insuring Agreement A.

Although many of the facts in the complicated chain of events that ended with the Bank's loss have not been clearly established, the following summary will suffice for the purposes of these motions. In June 1976, a South Carolina businessman named Raymond Starns was interested in finding a partner to finance the acquisition of certain businesses. Through a series of intermediaries, including an attorney, Donald Jones, and a Florida businessman, Richard Holtzman, Mr. Starns was introduced to Mr. Vaughn. On June 30, 1976, a charter for NBC was filed in St. Vincent. Mr. Starns was involved in the creation of this entity and persuaded a St. Vincent resident, Fitzroy Clarke, to act as president of the new entity. At that time, NBC had no assets, no depositors, no offices, no employees and no telephones.

At a meeting in Florida sometime in June 1976, at which Jones, Starns, Holtzman and others were present, Starns subscribed Clarke's name to a group of CDs on which the name of NBC was printed. It is disputed whether this meeting occurred before or after June 30, or whether Starns had Clarke's authorization to use Clarke's name. At a second meeting in July, Starns also signed Clarke's name to a second set of CDs. It was agreed at that meeting that the CDs would be given to Vaughn in order for Vaughn to "beef up" his financial statements and increase his line of credit.

Sometime early in August, Holtzman brought the CDs to Vaughn in New Jersey. During a meeting attended by Vaughn, Holtzman and others, Vaughn used a check-writing machine to fill in the names of the payees, amounts and maturities on certain CDs bearing Clarke's name.

The CDs, in denominations of $50,000 and $75,000, were made payable to Vaughn, one of his business associates and various members of his family. On August 26, 1976, Vaughn procured a loan from the Bank in the amount of $112,500 secured by two such CDs in the amount of $50,000 and $75,000. He induced his mother to obtain a similar loan in the amount of $112,000 on September 1. The loans were called by the Bank in mid-September.[1]

Vaughn and Martin received the proceeds of these loans with deductions made for outstanding loans. Some of the proceeds were channeled to Holtzman and Starns. In mid-September 1976 a small office in the name of NBC was opened in St. Vincent and a single employee engaged. At approximately the same time, Clarke executed a written power of attorney authorizing Starns to sign Clarke's name to papers acknowledging the collateral assignment of the CDs to the Bank.

In order to prevail on a motion for summary judgment, the moving party must demonstrate that (1) there are no genuine issues of material fact which must be resolved by a factfinder and (2) the undisputed facts establish the moving party's right to recover under the relevant law. Fed.R. Civ.P. 56; *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

After a review of the record, the court has concluded that Aetna's motion for summary judgment must be denied because material issues of fact remain to be resolved in connection with the Bank's right to recover under Insuring Agreement A. The court has further concluded, however, that it will grant, on its own motion, summary judgment to Aetna with regard to the right of the Bank to recover under either Insuring Agreements D or E, on the ground that

1. The lending officer who approved the loan, Jack E. Jensen, had been specifically instructed that he did not have authority to approve secured loans in amounts over $50,000. The factual issues that exist with respect to Mr. Jensen's involvement will be discussed *infra.*

even if certain remaining issues of fact were resolved in the Bank's favor, the Bank could not establish its right to recover under these Agreements. Accordingly, the Bank's motions are denied. *See Defelice v. Philadelphia Board of Education,* 306 F.Supp. 1345 (E.D.Pa.1969), *aff'd per curiam,* 432 F.2d 1358 (3d Cir.1970); 6 Moore's Federal Practice ¶ 56.12 (1982).

Although the reasoning underlying these conclusions is set forth in detail hereafter, the analysis of the court may be briefly summarized. If the plain language rule applied to this type of bond, the coverage could be simply stated as follows:

The bond insures that the documents submitted to the bank in connection with a loan are genuine and authentic. If they are not, and a loss is caused thereby, the bonding company guarantees the loss. On the other hand, the bonding company does not guarantee the truth of said documents. If they are not truthful, and a loss results therefrom, it is not guaranteed.

The allocation of such losses undoubtedly arises from the practicality of the situation. A bank cannot protect against counterfeit and forged documents. It can, on the other hand, investigate the assertions made therein through credit checks, appraisals, title searches, financial statements and the like.

In this particular case the documents relied upon were not counterfeit but may have been forged. But even if counterfeit *and* forged, the loss sustained by the Bank was not caused by the lack of authenticity or genuineness of the documents. On the contrary, the loss was caused by the fact that the statements contained in the document were not true. The assets represented thereby did not exist. If the documents were authentic and their signatures genuine and authorized, the loss nonetheless would have occurred. The failure of the

security was not because they were counterfeit or forged, but solely because the assets purportedly represented thereby were nonexistent. This loss falls upon the Bank and not the bonding company by the terms and intent of the bond. Summary judgment for the bonding company on these issues is therefore appropriate.

Whether the losses result from the dishonest acts of an employee presents issues of fact requiring a plenary trial for the reasons hereinafter set forth.

*Insuring Agreement E*

■ Insuring Agreement E provides in pertinent part that Fidelity will indemnify the Bank for:

Loss (1) through the Insured's having in good faith and in the course of business, whether for its own account or for the account of others, ... extended any credit ... on the faith of or otherwise acted upon any securities, documents, or other written instruments which prove to have been

(a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, signor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any other person signing in any other capacity....[2]

Insuring Agreement E defines "counterfeited" to mean "only the imitation of a security document or other written instrument, ... which is intended to deceive and be taken for an original." There is no dispute that the CDs in question come within the meaning of "securities, documents or other written instruments" as defined by Insuring Agreement E or that the Bank had physical possession as is also required by that Agreement. With respect to Insuring Agreement E, therefore, the issue is solely

---

**2.** Insuring Agreement E(1)(a) also indemnifies for a loss incurred because of the extension of credit secured by a security, document or other written instrument which is "raised or otherwise altered or lost or stolen ..." However, loss through forgery or alteration of a certificate of deposit is excluded by later language in Insuring Agreement E which provides:

EXCLUDING, in any event, loss through FORGERY OR ALTERATION of, on or in ... certificates of deposit ...; and excluding further, loss specified in subdivisions (1) and (2) of Insuring Agreement (D) ... whether or not any amount of insurance is applicable under this bond to Insuring Agreement (D).

whether what occurred under these facts was a counterfeiting.

The Bank argues that the CDs were not actually issued by NBC "but rather were imitations, intended to deceive and be taken for authentic CDs issued by a 'National Bank of Commerce'". Plaintiff's Brief in Support of Motion for Summary Judgment, p. 35. (Hereafter "Plaintiff's Brief"). Defendants contend that the existence of a counterfeited CD presupposes the existence of another CD which is authentic. The Bank does not allege that a second set of CDs existed which were the *real* CDs. Nor is there any issue that another "real" National Bank of Commerce existed.

One of the few facts upon which the parties do agree is that NBC had no assets to support the CDs. Thus, as Fidelity argues, the loss occurred because the CDs were worthless.

Both parties rely on *Whitney National Bank of New Orleans v. Transamerican Insurance Company,* 476 F.2d 632 (3d Cir. 1973). In *Whitney,* the plaintiff bank sought to recover under a bond similar to the one at issue here. The bond insured against losses incurred as the result of reliance upon instruments that later proved to have been counterfeited. The bond also contained general language excluding from coverage losses resulting from fraudulently secured loans except as specifically provided elsewhere. The loans at issue in *Whitney* had been extended in reliance upon warehouse receipts showing large quantities of soybean oil in storage tanks owned by the borrower. The receipts were authentic but overstated the amount of soybean oil actually being held.

The Third Circuit held that the warehouse receipts were not counterfeited for purposes of the bond. *Id.* at 634. In doing so, the Third Circuit adopted a line of cases in other circuits which had determined that counterfeited within the meaning of the

standard bankers bond "connotes spurious or imitative execution of a document as distinguished from the document's explicit or implicit misrepresentation of facts other than the genuineness of execution." *Id.*[3]

The bond construed in *Whitney* was structured similarly to the Bond at issue here. The Bank argues that the definition of "counterfeited" set forth in *Whitney* supports its position because the CDs were a spurious imitation of a document that would be issued by a real bank. This argument blurs the distinction that *Whitney* made between imitations of real documents and real documents that misrepresent facts. The CDs were harmful because they implicitly misrepresented a fact—the amounts available to NBC for its own account. Under *Whitney,* therefore, the CDs are not counterfeited within the meaning of the Bond.

### Insuring Agreement D

Insuring Agreement D provides in pertinent part that Fidelity will indemnify the Bank for "(D) Loss through FORGERY OR ALTERATION of, on or in any . . . certificates of deposit, . .". Insuring Agreement D does not define either forgery or alteration. The Bank suggests that guidelines may be drawn from the civil and criminal law of New Jersey. *See Filor, Bullard & Smyth v. Insurance Company of North America,* 605 F.2d 598 (2d Cir.1978).

Under the criminal law of New Jersey in effect at the time the events leading up to receipt of the CDs by the Bank, the crime of forgery was committed by

Any person who, with intent to prejudice, injure, damage or defraud any other person:

(a) Falsely makes, alters, forges, or counterfeits any record or other authentic matter of a public nature or character, or any printed or written instrument or indorsement, acceptance, transcript or assignment thereof; or

---

**3.** *See, e.g., Exchange National Bank of Olean v. Insurance Company of North America,* 341 F.2d 673 (2d Cir.), *cert. denied,* 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965); *Maryland Casualty Company v. State Bank & Trust Company,*

425 F.2d 979 (5th Cir.1970). The definition of counterfeited which the Bond contains is consistent with the definition formulated by the Third Circuit in *Whitney.* The term was not defined in the bond at issue in *Whitney.*

(b) Utters or publishes as true, any such false, altered, forged or counterfeited matter, know the same to be false, altered, forged or counterfeited. . . .

N.J.S.A. 2A:109–1. In New Jersey, the crime of forgery is defined as the "false making or materially altering, with intent to defraud, of any writing, which, *if genuine,* might apparently be of legal efficacy, or the foundation of legal liability" in *State v. Thrunk,* 157 N.J.Super. 265, 271, 384 A.2d 906 (App.Div.1978). Forgery has been held to include the later alteration of authentic and validly executed deeds (*State v. Thrunk*); a fraudulent endorsement, (*State v. Schultz,* 71 N.J. 590, 367 A.2d 423 (1976)); and the uttering a check inscribed with the name of a person who did not exist as the maker (*State v. Ruggiero,* 43 N.J.Super. 156, 128 A.2d 7 (App.Div.1956), *aff'd,* 25 N.J. 292, 135 A.2d 859 (1957)).

The Bank argues (1) that the CDs were forged because Starns signed the name of Clarke without authorization and Vaughn later completed (altered) the CDs and uttered them knowing that they were forged; and (2) because the bank upon which they were issued was a fictitious bank. Aetna contends that (1) genuine issues of material fact exist with respect to the question of whether the actions of Starns and Vaughn were authorized; (2) the evidence adduced by the Bank for purposes of this motion which purports to establish without dispute the unauthorized nature of Starns' and Vaughn's actions is inadmissible; (3) even if the actions of Starns and Vaughn were unauthorized, these actions were later ratified by Clarke when he executed a power-of-attorney to Starns and executed acknowledgements of the assignments of the CDs to the Bank; (4) NBC is not a fictional entity; and (5) even if the actions of Starns and Vaughn constituted forgery or alteration under Insuring Agreement D, forgery and alteration were not the causes of the Bank's loss.

It is clear that if the execution of Clarke's name by Starns was not authorized, a classic case of forgery would be presented. Moreover, if the completion of the CDs by Vaughn was unauthorized, a forgery would also exist. However, neither of these facts has been established without dispute.

The court has concluded, however, that the Bank would not be able to recover under Insuring Agreement D, even if all of the remaining factual issues with regard to these activities were resolved in favor of the Bank. The loss to the Bank was caused by the implicit misrepresentation in the CDs that NBC had assets which could be used to satisfy the obligations undertaken by Vaughn and Martin. Whether the signatures on the CDs were genuine or not, authorized or not, there could have been no recovery because those assets did not exist. Any forgery or alteration stemming from the specific activities of Vaughn and Martin did not cause the Bank's loss. Therefore, the Bank cannot recover under Insuring Agreement D.

The Bank's theory that it has a right to recover under Insuring Agreement D because NBC was a fictitious entity requires separate consideration. Independent of the authorization issue, under New Jersey law, if NBC were a fictitious entity, a forgery would have taken place under New Jersey criminal statutes. *See State v. Ruggiero,* 43 N.J.Super. 156, 128 A.2d 7 (App.Div. 1956), *aff'd* 25 N.J. 292, 135 A.2d 859 (1957). (Forgery includes issuance of check drawn on fictitious corporation). If the CDs were genuine, *i.e.,* drawn on a "real" bank,—but worthless, their issuance would not be a forgery under New Jersey law. *See State v. Berko,* 75 N.J.Super. 283, 291, 183 A.2d 118 (App.Div.1962).

It is not clear, however, what constitutes a "fictitious entity" under New Jersey law. The issue was not addressed in *State v. Ruggiero;* the analysis used in *State v. Berko* suggests that a corporation would *not* be considered a fictitious entity if it had a valid corporate charter. 75 N.J.Super. at 292, 183 A.2d 118 (Possible evidence which could have been offered by the State to prove fictitious nature of corporate drawer of a check included lack of corporate charter of proof of corporate dissolution). The

Bank also refers the court to discussions of when an individual would be regarded as a "fictitious person" under the former Negotiable Instruments Law. *See Ocean & C. Corporation, Ltd. v. Lincoln National Bank,* 112 N.J.L. 550, 172 A. 45 (E. & A. 1934).

■ Any forgery risk by means of a "fictitious entity" must be considered as having been assumed by the Bank by virtue of the contract between the parties. Where the issue is one of contract interpretation, the court is guided by the presumed intent of the parties. In re *Double H Products Corporation,* 462 F.2d 52, 54–55 (3d Cir. 1972); *Kearny PBA Local No. 21 v. Kearny,* 81 N.J. 208, 221, 405 A.2d 393 (1979). The Bond distinguishes between the "risk of authentication" (forgery and counterfeiting) against which the Bank could not reasonably protect itself and the credit risk posed by worthless collateral. Thus, Insuring Agreements D and E protect against risks of authentication and genuineness. Section 2(e) *excludes* credit risks. It is well-settled that the standard bankers bond is not a form of credit insurance. *See Calcasieu-Marine National Bank of Lake Charles v. American Employers Insurance Company,* 533 F.2d 290, 299 (5th Cir.1976), cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Given this division of risks within the Bond, the court concludes that the parties intended that the Bank would assume the risk of the collateral being worthless. *See id.* at 298; *see also Exchange National Bank of Olean v. Insurance Company of North America,* 341 F.2d 673, 676 (2d Cir.1965). "Fictitious entity" as the Bank uses it in connection with this case simply means that NBC had no assets to back its paper. Even though the knowing issuance of corporate paper by a corporation which is totally without assets, may be a forgery under New Jersey law, the risk of a corporation's being fictitious in this sense is a credit risk which is allocated to the Bank by the Bond. The parties would expect the Bank to protect itself against the risk posed by the possible worthlessness of the CDs through its normal credit evaluation procedures.

In cases involving similarly structured bonds, courts have found recovery barred by the loan exclusion clause where the underlying problem was undervalued or nonexistent collateral. *See, e.g., First National Bank and Trust Company v. Continental Insurance Company,* 510 F.2d 7 (10th Cir.), cert. denied, 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975); *Maryland Casualty Company v. State Bank & Trust Company,* 425 F.2d 979 (5th Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *Third Federal Savings & Loan Association v. Fireman's Fund Insurance Company,* 548 F.2d 166 (6th Cir.1977); *Capitol Bank v. Fidelity and Casualty Co.,* 414 F.2d 986 (7th Cir.1969). In the cases cited by the Bank where courts have refused to require the Bank to prove the value of the underlying collateral, forgery was conceded. *See, e.g., St. Paul Fire & Marine Insurance Co. v. Bank of Stockton,* 213 F.Supp. 716 (N.D.Cal. 1962); *Baltimore Bank & Trust Company v. United States Fidelity & Guaranty Company,* 436 F.2d 743 (8th Cir.1972). In this case, the court is asked to view the nonexistence of the underlying collateral as the forgery itself. In *St. Paul Fire & Marine,* the court expressly distinguished its case from those where "the forged document would have been worthless from the day it was signed even if the signature had been good." 213 F.Supp. at 719.

The Bank argues that ambiguities in the Bond "must be resolved against the insurer and in favor of coverage." *Fidelity & Deposit Company of Maryland v. Hudson United Bank,* 653 F.2d 766, 772 n. 8 (8th Cir.1981). This special rule of construction is to be followed, however, only when an ambiguity exists. *See, e.g., Maryland Casualty Co. v. State Bank & Trust Co.,* 425 F.2d 979, 982 (5th Cir.1970). The court does not find either Section 2(e) or Insuring Agreements D or E to be ambiguous.

It is undisputed that the events which culminated in the Bank's loss were permeated by fraud, whatever the exact details. It must be emphasized, however, that a loss caused by fraud or false pretenses is expressly excluded from coverage by Sec-

tion 2(e) *unless* the fraud can be classified as forgery or counterfeiting and the forgery or counterfeiting causes the loss or unless the fraud results from the actions of a dishonest employee. The misrepresentation as to assets in this case was not a forgery within the meaning of the Bond nor was the Bond counterfeit. Moreover, although the Bank might be able to prove at trial that either Starns or Vaughn, or both, committed forgery, the Bank's loss was not caused by whatever unauthorized execution, alteration or completion did occur.

Because the court has concluded that even if the remaining issues of fact were resolved in the Bank's favor, it could not prove its right to recover under either Insuring Agreement D or E, the court, on its own motion, will grant summary judgment to Aetna with regard to those claims. *See DeFelice v. Philadelphia Board of Education,* 306 F.Supp. 1345 (E.D.Pa.1969), *aff'd per curiam,* 432 F.2d 1358 (3d Cir.1970); 6 Moore's Federal Practice ¶ 56.12 (1982).

*Insuring Agreement A*

■ The chief lending officer at the Bank at the time of the loans to Mr. Vaughn and Mrs. Martin was Jack E. Jensen. Mr. Jensen had been one of the founders of the Bank and had held several important positions within the Bank prior to 1976. In April 1976, the Board of Directors of the Bank became concerned about large loans made by Mr. Jensen to an individual named Paul Zeller. As a result, the Board limited Mr. Jensen's lending authority to $50,000 on secured loans and $15,000 on unsecured loans. It is undisputed that the loans to Mr. Vaughn and his mother exceeded these limits.

Insuring Agreement A of the bond provides coverage for:

"(a) Loss resulting directly from dishonest or fraudulent acts of an Employee

committee alone or in collusion with others.

"Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent;

"(a) to cause the Insured to sustain such loss and

"(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." [4]

Aetna contends that exceeding authority in approving loans would not be regarded as within the meaning of dishonesty or fraudulent conduct for purposes of Insuring Agreement A. Aetna supports its position by reference to admissions which it states are contained in statements made by the Bank's former attorney in a related proceeding and in a Pretrial Memorandum filed by the Bank. Lastly, Aetna argues that if exceeding one's authority in approving loans is dishonesty within the meaning of Insuring Agreement A, then Aetna's coverage of Jensen as an employee of the Bank had already terminated by the time of the events in question, because Jensen had exceeded his loan approval authority earlier in the spring of 1976 with respect to loans made to other individuals. Section 11 of the Bond terminates coverage as to any Employee as soon as the Bank learns of dishonest or fraudulent conduct on the part of that Employee.

Plaintiff argues that the question of Jensen's dishonesty does not rest solely on the fact that the approval of the loans was

4. Prior to June 15, 1976, Insuring Agreement A provided coverage for:

"(a) Loss through any dishonest or fraudulent act of any Employees, committed anywhere and whether committed alone or in collusion with others, including loss, through any such act of any of the Employees, of Property held by the Insured for any purpose

or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor."

The language in the text was added by a rider effective on June 15, 1976 and must be considered controlling here. Much of the case law cited by the parties construes the earlier language used in the standard bond.

unauthorized. Plaintiff contends that numerous factual issues exist with respect to the crucial question of intent.

The court concludes that genuine issues of material fact exist with respect to the Bank's right to recover pursuant to Insuring Agreement A.

Questions of intent, which are clearly crucial here, are normally inappropriate for summary disposition. 6 Moore's Federal Practice ¶ 56.17(41.–1). Intent to injure or defraud may be inferred from the fact of injury, if injury is the natural result of a voluntary act on the part of the employee. *See United States v. Schmidt,* 471 F.2d 385, 386 (3d Cir.1972) (In criminal prosecution for misapplication of bank funds, intent to injure and defraud exists if person acts knowingly and if natural result of conduct would be to injure or defraud bank even though this may not have been person's motive.) It is clear from the language of the Bond that although an intent to benefit financially must be shown, a showing that the employee intended to benefit someone other than himself will satisfy this requirement.

Aetna has submitted a certification from Mr. Jensen in which Mr. Jensen states that at all times, he thought that he was acting in the best interests of the Bank and in furtherance of the Bank's goal to develop its lending activities among successful businesspersons in the community.

On the other hand, the Bank has adduced deposition testimony from Mr. Jensen to show that Mr. Jensen had been personally acquainted with Mr. Vaughn and Mrs. Martin for several years prior to the loans in August 1976. Mr. Jensen's handling of previous loans to these persons was also characterized by questionable banking practices. Mr. Jensen made no independent investigation of the value of the collateral offered by the two in connection with the loans in August 1976. He knew at the time that he was exceeding his recently restricted lending authority. Further deposition testimony of Mr. Jensen and that of other bank officials suggests that Mr. Jensen initially withheld information concerning the loans from the Board of Directors, subsequently lied to the Board by stating that the CDs were drawn on a large Canadian bank and falsified minutes of a Board meeting at which the loans were discussed.

This proffered evidence indicates that the Bank does not rely solely on the fact that Mr. Jensen exceeded his lending authority in making loans in order to prove Mr. Jensen acted dishonestly or fraudulently. The authorities cited to support the proposition that recovery under Insuring Agreement A cannot be based solely on the unauthorized nature of the employee's lending activities are therefore inapposite.

Based on the evidence outlined above, reasonable persons might differ on the crucial question of intent. Under these circumstances, summary judgment is not appropriate.

The court's conclusion is not altered by the statement of prior counsel for the Bank during state court proceedings that he had concluded that Mr. Jensen's activities were neither dishonest nor fraudulent within the meaning of Insuring Agreement A. See Transcript of Hearing Before Judge Trautwein, April 2, 1980, at pp. 19–21, Exhibit E to Defendant's Memorandum in Opposition. Although this statement may be admissible at trial as an admission of a party opponent, *see* Fed.R.Evid. 801(d)(2)(C), it is not dispositive of the issue for these purposes. This is especially true since in reaching his conclusion, prior counsel relied heavily on the fact that Mr. Jensen's activities had brought him no financial benefit. As indicated previously, the Bank does not have to demonstrate that Mr. Jensen profited personally in order to recover under Insuring Agreement A.

For the foregoing reasons, the Bank's motion for summary judgment with respect to Insuring Agreement D and Insuring Agreement E is denied and summary judgment is granted to Aetna on these claims. Aetna's motion for summary judgment in connection with Insuring Agreement A is denied. Counsel for Aetna will submit an order in accordance with this opinion.