**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0149n.06

**No. 11-6328**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Feb 12, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FORCHT BANK, N.A. | ) | |
| | ) | |
| *Plaintiff-Appellant,* | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | KENTUCKY |
| BANCINSURE, INC., | ) | |
| | ) | |
| *Defendant-Appellee.* | ) | |

**BEFORE:**    **MOORE, COLE, Circuit Judges, and ROSE, District Judge.**[*]

**ROSE, District Judge.**  Plaintiff-Appellant Forcht Bank, N.A., challenges the award of summary judgment to Defendant-Appellee BancInsure, Inc., on Forcht Bank's claims that BancInsure failed to pay Forcht Bank pursuant to a bond purchased from BancInsure to protect Forcht Bank from losses directly attributable to forgeries.

BancInsure had issued Forcht Bank a financial institution insurance bond. The type of bond BancInsure issued was once referred to as a "bankers' blanket bond." See Hugh E. Reynolds, Jr. *Fidelity Bonds and the Restatement*, 34 Wm. & Mary L. Rev. 1249, 1262 (1993). These bonds shed the "blanket" appellation, however, when the industry rewrote the forms used to create them in the

---

[*]The Honorable Thomas M. Rose, United States District Court for the Southern District of Ohio, sitting by designation.

1980's, to invert the presumption of coverage. *Id.* The result is that what the bond does not cover

is sometimes broader than what it does.

Thus it is that the loan loss exclusion at Section 2(e) of the Bond bars coverage for direct or

indirect losses from default, as it states "This Bond does not cover":

> Loss resulting directing or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements, or Evidences of Debt, whether such loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreement (A), (D), (E), (P) or (Q).

Rec. 38-18, pg. ID # 570.

Similarly, regarding forgery, it also states: "This Bond does not cover...loss resulting directly

or indirectly from forgery or alteration, except when covered under Insuring Agreement (A), (D), (E)

or (F)...." *Id.* It is under the exceptions of Insuring Agreements D and E that Forcht Bank sought

recovery.

Insuring Agreement D is entitled "FORGERY OR ALTERATION." This loss exclusion

refers only to direct losses, omitting coverage for indirect losses. Under this provision, BancInsure

agreed to indemnify Forcht Bank for "loss resulting directly" from:

> (2)     transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any financial institution, but which instructions or advices

2

> either bear a signature which is a Forgery or have been altered without the knowledge or consent of such customer or financial institution ….

Rec. 38-18, pg. ID #555. BancInsure denies that the written instruction Forcht Bank alleges gives rise to coverage is "directed to the insured" or "bear[s] a signature which is a Forgery."

Later, the agreement defines "Forgery" as "signing of the name of another person or organization with the intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose." Rec. 38-18, pg. ID #568.

The other provision under which Forcht Bank seeks recovery is Insuring Agreement E, entitled "Securities." Under this provision, BancInsure agreed to indemnify Forcht Bank again for direct losses, though not indirect ones:

> Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1)     acquired, sold or delivered, given value, extended credit or assumed liability on the faith of any original
>
>      (a)     Certified Security,
>
>      * * *
>
>      (d)     Certificate of Origin or Title,
>
>      * * *
>
>      (g)     Security Agreement,
>
>      * * *
>
>      (i)     Statement of Uncertified Security, which

> (i)    bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery....

Rec. 38-18, pg, ID #556.  The agreement also defines "Security Agreement," which is "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." Rec. 38-18 pg. ID #568.

Forcht Bank asserts that BancInsure is required to indemnify it for loans made to Aircraft Services, LLC, loans that were secured by a life insurance policy issued to Aircraft Services' principal, Richard Brunsman, Jr.  On August 26, 2009, Brunsman applied for a $1,200,000 loan with Forcht Bank in order to provide Aircraft Services "working capital." Rec. 37-3, pg. ID #303. Brunsman was the sole owner of Aircraft Services. Rec. 38-4, pg. ID #470.

A life insurance policy Brunsman had purchased from Lincoln Financial Group was to secure the loan.  In the course of the loan application process, Brunsman provided to Forcht Bank a letter dated May 26, 2009.  Addressed to "Client," on what appears to be Lincoln Financial Group letterhead, the letter states that the accumulated cash value of the life insurance policy was $1,766,361, with a death benefit of $2,441,361. Rec. 37-4, pg. ID #359.  The letter is signed by a "Virginia Campbell."

Forcht Bank approved Aircraft Services' loan application, and the loan closed at the Forcht Bank Branch located in Burlington, Kentucky, on September 21, 2009. Rec. 37-4, pg. ID #348.  The Commercial Line of Credit Agreement and Note executed on September 21, 2009 describes the collateral as:

- Assignment of Life Insurance Policy with a cash value of $1,765,400.80 and a face value of $2,441,361.14, dated September 21, 2009 evidencing security interest in Life Insurance Policy #23 7948064.

- Security Agreement dated September 21, 2009 evidencing security interests in All accounts and contract rights; Chattel Paper; Deposit Accounts; Documents; Equipment; General Intangibles; Instruments; Inventory; Investment Property; All products and proceeds of the collateral;.

Rec. 37-4, pg. ID # 356.

The next day Forcht Bank disbursed the money, upon receipt of all of these documents from Brunsman. Aircraft Services defaulted on the loan on February 21, 2010, and Forcht Bank thereafter contacted Lincoln National to assert a claim against the life insurance policy. Rec. 1-1, ¶¶ 9, 10.

Lincoln National responded by letter dated March 5, 2010, stating:

This letter is in response to our recent conversation on March 3, 2010. Forcht Bank is not an assignee of the stated policy. The assignment form that Forcht Bank submitted to The Lincoln National Life Insurance Company dated September 22, 2009, is apparently a forgery. As such, The Lincoln National Life Insurance Company has no record of any assignment of the policy to Forcht Bank. However, if you would like Forcht Bank to become an assignee of the policy, please complete and return to me, at the above address, the enclosed Assignment Of Life Insurance Or Annuity Policy As Collateral Security form.

Rec. #1-1, Exhibit C. Forcht Bank elected not to complete and return to Lincoln National the Assignment of Life Insurance or Annuity Policy as Collateral Security form.

The life insurance policy did not have a cash value of $1,766,361. In a Voluntary Petition filed by Brunsman on March 5, 2010 in the United States Bankruptcy Court for the Southern District of Ohio (Case No. 1:10-bk-11371), Brunsman stated that the surrender value of the life insurance policy was only $65,000. Rec. 37-9, pg. ID # 417. The death benefit was only $323,879. Rec. 44-1, pg. ID # 712. Moreover, Brunsman had assigned the Policy to multiple banks. Rec. 38-3, pg. ID #

5

466. The District Court therefore correctly characterized the Policy as "a largely worthless asset" because the value was grossly overstated and what funds there were had already been assigned to other banks. Rec. 47, pg. ID # 725.

Forcht Bank sought indemnity from BancInsure, and was denied. Forcht Bank filed a complaint in Fayette County, Kentucky, asserting, *inter alia*, breach of contract, breach of duties of good faith and fair dealing, and bad faith denial of coverage. BancInsure removed the case to the United States District Court for the Eastern District of Kentucky, and the parties filed cross-motions for summary judgment. The district court awarded summary judgment to BancInsure on all claims, Rec. 47, and Forcht Bank appealed to this Court. Rec. 49.

## II.     Jurisdiction

The district court had diversity jurisdiction in this case by virtue of 28 U.S.C. § 1332. As the appeal was timely filed, we have jurisdiction under 28 U.S.C. § 1291.

## III.     Standard of Review

A district court's grant of summary judgment is reviewed *de novo*. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this question, the Court reviews the record in the light most favorable to the nonmoving party, drawing "all justifiable inferences" in her favor. *Id.* at 255.

## IV.     Analysis

Kentucky insurance law is relatively sparse, but a few general guiding principles guide the panel in its review of this case.  In Kentucky, when an insurance policy has conflicting exclusions that create an ambiguity about the extent of coverage, a court should read the ambiguity in favor of the insured:

> As long as coverage is available under a reasonable interpretation of an ambiguous clause, the insurer should not escape liability.... As to the manner of construction of insurance policies, Kentucky law remains clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured.  Doubt as to the coverage of a policy should be resolved in favor of the insured.  Since the policy is drafted in all details by the insurance company, it therefore must be held strictly accountable for the language used.
>
> A policy of insurance is to be construed liberally in favor of the insured and if, from the language, there is doubt or uncertainty as to its meaning, and it is susceptible to two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted.

*St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994).

> The court also clarified, however, that its reading should not be taken too far.
>
> The rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract. Neither should a nonexistent ambiguity be utilized to resolve a policy against the company. We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer.

*Id.* at 226-227.

Similar principles are repeated frequently in Kentucky cases. See, e.g., *City of Louisville v. McDonald*, 819 S.W.2d 319, 321 (Ky. Ct. App. 1991) ("As contracts the terms therein should be

7

given their ordinary meaning as persons with the ordinary and usual understanding would construe them . . . insurers draft their own policies, and must be held strictly accountable for their terms."); *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992) ("(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and, (2) exceptions and exclusions should be strictly construed to make insurance effective.") Insurance contracts should be given their ordinary and plain meaning but ambiguity or uncertainty should be interpreted against the drafter.

As regards assignments in Kentucky, one court has claimed that a clause stating "[n]o assignment of this policy shall take effect until written notice thereof shall be given to the company," had no effect on assignments. *Thompson's Ex'x v. Thompson*, 226 S.W. 350, 351 (Ky. Ct. App. 1920). The court explained:

> In the first place written notice was given to the company, but even if this had not been done, or if the policy had contained a provision that an assignment would be ineffectual without the company's consent, a failure to comply therewith would not have affected the validity of the assignment as between the assignor and assignee, since such provision in a life insurance policy is for the benefit and protection of the company alone.

*Id.*

Forcht Bank asserts that it is entitled to coverage under the bond by virtue of the May 26, 2009 letter on Lincoln Financial Group letterhead and three documents that Forcht Bank collectively characterizes as "Assignment Documents." These are: 1) a Consent and Request for Assignment of Life Insurance Policy, Rec. 37-4, pg. ID #360, 2) an "Assignment of Life Insurance Policy Contract,"

Rec. 38-12, pg. ID# 360, and 3) an "Assignment of Life Insurance or Annuity Policy Contract as Collateral Security." Rec. 38-13, pg. ID# 531.

Forcht Bank asserts that Insuring Agreement D protects against it having extended credit based upon the May 26, 2009 letter on Lincoln Financial Group letterhead, and Insuring Agreement E protects against it having extended credit based upon forged securities. BancInsure counters that any loss due to these circumstances is indirect at best, and in fact not covered at all. As regards Insuring Agreement D, it protects against "giving any value on the faith of any written instructions or advices *directed to the Insured* ...which instructions or advices purport to have been signed or endorsed ... by any financial institution, but which instructions or advices ... bear a signature which is a Forgery…." Rec. 38-18, pg. ID #555.

It is true that Brunsman fabricated the May 26, 2009 letter, and did so to acquire the loan. Rec. 38-4, pg. ID #471-73. It is also true that Virginia Campbell is an existing, as opposed to fictitious, person. However, while Brunsman has admitted to forging her name to this document, the letter is directed to "Client," who is Brunsman, and not to Forcht Bank. Rec. 37-3, pg. ID #296-97. The May 26, 2009 letter on Lincoln Financial group letterhead is not directed to the insured.

Finally, the Consent and Request form Forcht Bank prepared states, in relevant part:

> The Policy Owner ('I') hereby notifies the Insurance Company ('you' or 'your') of his/her intended assignment of the Life Insurance Policy(ies) described herein to the Lender as collateral security. I am hereby directing you to provide the following requested information to the Lender. Please complete the acknowledgment copy of this form and return to the Lender in the enclosed envelope as soon as possible. I can no longer receive any loans from you against the Policy until you receive written consent from the Lender.

Rec. 37-4, pg. ID# 360.  As completed by Brunsman, this form claims that the "Current Cash Surrender Value" of policy had grown to $1,802,051.28.  In the spaces created by Forcht Bank for the "AUTHORIZED SIGNATURE OF INSURANCE COMPANY REPRESENTATIVE," appears the signature of "Virginia Thompson," and on the line below this is typed "by" next to which "Virginia Thompson" is hand printed.  The notary seal on this document appears as merely a stamp, without a notary's signature, or other handwriting.  On its face, this document does not purport to effectuate any assignment, but only an intended assignment.  Therefore the district court correctly ruled that Forcht Bank cannot recover under Insuring Agreement D.

Even if the May 26, 2009 letter on Lincoln Financial Group letterhead had been directed to Forcht Bank, as required for coverage under Insuring Agreement D, or the assignment documents had come under the ambit of Insuring Agreement E, Insuring Agreements D and E only protect the bank from losses *directly* proceeding from good faith reliance upon securities that are forged.  "It is well settled that the standard banker's bond is not a form of credit insurance." *Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F. Supp. 860, 866 (D.N.J. 1983).  There can be no recovery if "the forged document would have been worthless from the day it was signed even if the signature had been good." *Id.*, (quoting *St. Paul Fire & Marine Ins. Co. v. Bank of Stockton*, 213 F. Supp. 716 (N.D. Cal. 1962)).

In the instant case, the underlying collateral was essentially worthless from the day it was signed.  It is from this point that Forcht Bank's loss directly flows.  Indeed, no even indirect loss appears attributable to the fact that the documents were fabricated, as, considering that if they had been genuine, Forcht Bank would have borne the same loss.

10

**V.      Conclusion**

Because the contractual stipulations for indemnity were not met, we **AFFIRM** the judgment of the district court awarding summary judgment to Defendant-Appellee.