WILLIAM ISELIN & CO., INC., Respondent-Appellant, v FIRE-MAN'S FUND INSURANCE COMPANY, Appellant-Respondent.

First Department, May 8, 1986

## APPEARANCES OF COUNSEL

*Peter M. Dodson* of counsel *(John E. Beerbower* and *Daniel J. Kramer* with him on the brief; *Cravath, Swaine & Moore,* attorneys),* for respondent-appellant.

*Jerome Murray* of counsel *(Robert Wang* and *Robert G. Post* with him on the brief; *Hendler & Murray, P. C.,* attorneys), for appellant-respondent.

## OPINION OF THE COURT

MILONAS, J.

On or about June 17, 1975, plaintiff William Iselin & Company entered into an accounts receivable financing agreement with the W. C. Lawson Cotton Company of Georgia, Inc. Pursuant to this arrangement, Iselin was to make advances to Lawson Cotton based upon 90% of the net amount of accounts receivable generated by Lawson Cotton. W. Carlton Lawson was the chief executive and chief operating officer of Lawson Cotton, a company engaged in the business of purchasing and reselling bulk cotton. Iselin extended its advances to Lawson Cotton upon receipt at its New York office of an assignment, with invoices attached, setting forth the goods that Lawson Cotton had shipped to its customer and including a bill of lading or other delivery document issued by the carrier who made the delivery.

The carrier which generally delivered the orders of Lawson Cotton was the Lawson Trucking Company, Inc., owned and operated by Jordan Lawson, the brother of W. Carlton Law-

son. Almost every bill of lading and delivery document assigned to Iselin bore the stamped signature of "Lawson Trucking Co., Inc., J. Lawson, President." However, Jordan Lawson subsequently testified at a deposition that he had never authorized anyone to purchase the stamp or to use it, while one of Lawson Cotton's employees admitted that it was he and not a representative of Lawson Trucking who invariably stamped the signature on the documents in question.

In August of 1979, Iselin discovered that Lawson Cotton was engaged in a scheme to defraud Iselin into purchasing fictitious accounts receivable. The fraud consisted primarily of assigning forged bills of lading, forged delivery documents and invoices reflecting nonexistent transactions. These spurious invoices were frequently exact handwritten duplications of previously assigned invoices. Another form of the fraud occurred by means of the establishment by Lawson Cotton of bogus checking accounts in the names of three of its customers. In order to create the appearance of periodic customer payments of the false invoices, W. Carlton Lawson would draw checks upon these accounts and himself forge the names of the payors.

In September of 1979, Iselin notified its insurer, defendant Fireman's Fund Insurance Company, of the losses which it had sustained as a result of the Lawson Cotton fraud. The policy involved was a standard bankers blanket bond which had been issued to the C.I.T. Financial Corporation and certain of its subsidiaries, among them Iselin. The bond consisted of 16 riders, one of which was entitled "Cosurety Rider" and contained a pro rata clause apportioning liability among three cosureties with Fireman's Fund denoted as the "Controlling Company". Unlike the other riders, the cosurety provision did not have a signature line for the insured to indicate its acceptance. A sworn proof of loss was filed by Iselin in June of 1980 detailing the fraud and accompanied by copies of each invoice for which Iselin did not receive payment, along with the delivery documents bearing the unauthorized stamp of Lawson Trucking.

Although defendant investigated the claim for two years, and on four occasions extended the time in which Iselin might commence suit under the bond, it never advised plaintiff that in its opinion the fictitious invoices were not counterfeited or that the bills of lading and delivery documents were not forged or that coverage would be declined. Finally, in September of 1982, plaintiff commenced the instant action seeking

recovery of $4,430,060.41. In that regard, Iselin alleged in its complaint that the bills of lading and delivery documents upon which it relied in making advances to Lawson were forged as to signature and that these documents, along with the invoices, were counterfeited within the contemplation of insuring agreement (E) of the bond.

According to insuring agreement (E), Iselin was to be indemnified against any:

"Loss (1) through the Insured's having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been

"(a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity".

Fireman's Fund answered by raising some 11 affirmative defenses. It subsequently moved for summary judgment, which motion was denied by Special Term. The court did, however, grant plaintiff's cross motion to strike the fourth, fifth, sixth and seventh affirmative defenses only to the extent of striking the seventh affirmative defense relating to defendant's assertion that pursuant to the cosurety rider it had no more than a limited liability of one third of any covered loss. In its fourth, fifth and sixth defenses, Fireman's Fund contends that plaintiff's alleged losses were excluded from coverage because the documents at issue herein were neither counterfeited nor forged as to signature within the meaning of the bond.

At the outset, it should be noted that nearly all of the bills of lading and delivery documents herein contained false signatures. The stamped printed signatures of "Lawson Trucking Co., Inc., J. Lawson, President" affixed to the bills of lading and delivery documents were forged by an employee of Lawson Cotton since the stamp was being so utilized without the knowledge or consent of Jordan Lawson. Yet, Fireman's Fund claims that the documents were not "forged as to signature" because nowhere did they include a handwritten or facsimile handwritten signature. Neither New York law nor the Uni-

form Commercial Code, however, supports defendant's hyper-technical definition of the word "signature" *(see,* General Construction Law § 46; UCC 3-401 [2]). Pursuant to General Construction Law § 46: "The term signature includes any memorandum, mark or sign, written, printed, stamped, photo-graphed, engraved or otherwise placed upon any instrument or writing with intent to execute or authenticate such instru-ment or writing."

Nor can the statement in the bond that "mechanically reproduced facsimile signatures are treated the same as hand-written signatures" be reasonably read to mean that only script signatures are valid within the context of the bond. Indeed, Lawson Trucking did, in fact, generally sign its docu-ments in precisely the manner undertaken by Lawson Cotton in the furtherance of its fraudulent scheme. Since it is evident that the instruments were forged as to signature, the fourth, fifth and sixth affirmative defenses should have been dis-missed.

Defendant also argues that an insured may only collect under the policy where the supposed fraud involved an at-tempt to imitate genuine documents and not simply because the instruments relied upon contained false representations. In that regard, a divergence of opinion has developed in the Federal courts as to whether documents reflecting entirely fictitious transactions can be considered counterfeited under the bond. The majority view has adopted the restrictive posi-tion urged by defendant, which is exemplified by the Second Circuit's decision in *Exchange Natl. Bank of Olean v Insur-ance Co. of N. Am.* (341 F2d 673). In that case, the bank made payments on documents in which the signatures were valid and authorized (unlike the situation before us) and referred to existing accounts but contained misrepresentations as to facts —specifically, shipments were not made as alleged. The court declared therein that: "A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer" *(supra,* at p 676).

In accordance with this holding, any losses suffered by the insured are recoverable under the blanket indemnity bond only where the instruments themselves imitate the genuine or

where they contain a forgery. *(See, Whitney Natl. Bank v Transamerica Ins. Co.,* 476 F2d 632 [3d Cir]; *Maryland Cas. Co. v State Bank & Trust Co.,* 425 F2d 979 [5th Cir]; *Capitol Bank v Fidelity & Cas. Co.,* 414 F2d 986 [7th Cir]; *First Natl. Bank & Trust Co. v United States Fid. & Guar. Co.,* 347 F2d 945 [10th Cir]; *North Carolina Natl. Bank v United States Cas. Co.,* 317 F2d 304 [4th Cir]; *First Natl. Bank v Glens Falls Ins. Co.,* 304 F2d 866 [4th Cir].) It is significant that even under the restrictive view, the insured will be compensated for its losses where, as in the present matter, the signatures are forged.

A minority of courts, on the other hand, consider a counterfeit instrument to be simply "something that purports to be something that it is not." *(Fidelity Trust Co. v American Sur. Co.,* 268 F2d 805, 807 [3d Cir]; *but see, Whitney Natl. Bank v Transamerica Ins. Co., supra,* in which the Third Circuit declared that it was persuaded by the contrary authority and would no longer follow its earlier decision.) As the court explained in *American Natl. Bank & Trust Co. v Fidelity & Cas. Co.* (431 F2d 920), all losses are covered by the policy where value has been extended on the faith of counterfeit documents whether the counterfeit is due to the lack of a genuine signature or from some other manner. Thus, while a forged instrument is necessarily a counterfeit, a counterfeit instrument need not always involve a forgery. *(See also, First Natl. Bank v Aetna Cas. & Sur. Co.,* 610 F2d 424 [6th Cir]; *American Ins. Co. v First Natl. Bank,* 409 F2d 1387 [8th Cir].)

In *Security Natl. Bank v Fidelity & Cas. Co.* (246 F2d 582 [7th Cir]) the court, in a case in which a genuine signature was affixed to invoices which did not represent actual merchandise sold or shipments made, determined that there was no real distinction between the fraudulent application of a false signature to a true instrument and putting a real signature to a false statement. Both of these actions were found by the court to come within the meaning of forgery since, in each instance, the essence of the conduct is the intent to injure or deceive. While it is true that the fraud in the instant matter did not involve the creation of totally fictitious documents in that the accounts and the customers were real enough, it is certainly undisputed that there was no effort here merely to duplicate another instrument or writing which was authentic. Yet, the narrow construction of the blanket bond which defendant would have this court apply does not appear to be the more reasonable usage.

Indeed, when previously confronted with this issue in a case bearing some similarity to the one before us now, we concluded in *Prudential Capital Corp. v Royal Indem. Co.* (21 AD2d 664) that "losses incurred through reliance on entirely spurious documents are covered, even though no forged signature is involved." In the opinion of the court, the language of the insurance policy extends to documents which are counterfeit in respect other than the forgery of signatures, but "[w]hatever may be the true lexicographical interpretation, the test remains what the reasonable expectation of the ordinary businessman would be".

The fact that in 1969 the standard blanket bond was revised to add a definition of "counterfeited" does not mandate a contrary result. The bond states that counterfeited "shall be deemed to mean only an imitation of a security, document or other written instrument * * * which is intended to deceive and be taken for an original." However, this definition does not preclude the inclusion of fictitious documents or specify that the spurious documents must duplicate already existing genuine documents. There is, in fact, no reference in the bond to genuine or authentic but simply to documents "intended to deceive and be taken for an original". Moreover, nothing in insuring agreement (E) requires that the terms "original" be taken to mean anything other than the usual sense of an original copy of a document as opposed to a duplicated one such as a carbon or photostat.

By any reasonable measure, the invoices and delivery documents forwarded to plaintiff by Lawson Cotton were clearly "intended to deceive and be taken for an original". Although these documents may have reflected wholly fictitious transactions, they did imitate prior invoices and delivery documents representing real accounts and customers. The forged checks drawn by W. Carlton Lawson endeavored to show payments from the customers of Lawson Cotton by imitating prior checks that constituted actual payment. Defendant's highly narrow construction of its obligations, if accepted by this court, would eviscerate the protection afforded by insuring agreement (E) of the bond. Where the instruments by which the misrepresentations were effected have no intrinsic value in themselves (unlike cash and possibly documents such as stocks or bonds), are nonnegotiable and, therefore, not the usual subjects of counterfeiting, it is unreasonable to insist that a document or writing be deemed counterfeit only where it attempts to imitate an existing authentic document.

Indeed, one would be hard pressed, in transactions involving accounts receivable financing, to conceive of an example of a counterfeit document which would be covered under this policy unless the less restrictive view of counterfeiting is applied. The fact is that the bankers blanket bond was originally devised for the specific purpose of offering protection to banks and other such financial institutions. While it might make sense, in dealing with the banking industry, to restrict the definition of "counterfeited" to an attempt to imitate or simulate another document which is authentic (stocks and bonds could certainly be imitated), the situation is quite different where an insurance company chooses to issue the same standard bankers bond in connection with factoring arrangements. Since it is virtually impossible for counterfeiting, as narrowly construed, to occur in accounts receivable financing, the insurer, by disclaiming coverage for any fraud other than a forged signature or the imitation of a preexisting original, has in effect been accepting payment without providing the protection specified in its policy. Furthermore, the law is well established that "policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured" (*Miller v Continental Ins. Co.*, 40 NY2d 675, 678). Consequently, we reaffirm the position taken by this court in *Prudential Capital Corp. v Royal Indem. Co. (supra)*. We have considered defendant's other arguments and find them to be without merit.

Accordingly, the order of the Supreme Court, New York County (Alvin F. Klein, J.), entered on May 6, 1985, which denied defendant's motion for summary judgment, denied plaintiff's cross motion to dismiss the fourth, fifth and sixth affirmative defenses and granted plaintiff's cross motion to dismiss the seventh affirmative defense, should be modified, on the law, to the extent of granting plaintiff's cross motion to dismiss the fourth, fifth and sixth affirmative defenses, and otherwise affirmed, without costs or disbursements.

SANDLER, J. (dissenting in part). I agree with that part of the court's opinion, and for the reasons stated, that finds those documents on which an unauthorized stamped signature appeared to be "forged as to signature", and also "counterfeited", within the meaning of the relevant language in insuring agreement (E) of the bankers blanket bond. I do not agree with that part of the court's opinion which concludes that, wholly without regard to the stamped signatures, the docu-

ments were "counterfeited" within the meaning of paragraph (E) of the insuring agreement, a conclusion that inexplicably departs from what may fairly be considered the well-established judicial construction. Since there may be transactions involving documents on which the stamped signatures did not appear, the issue has legal significance with regard to the determination of the motion to strike the fourth, fifth and sixth affirmative defenses, and therefore, requires discussion.

Disagreeing with what is indisputably the overwhelming weight of authority, the court majority now holds that the word "counterfeited" as used in the insuring agreement in fact means fraudulent or fictitious and embraces any apparently authentic instrument which purports to describe a transaction that did not in fact take place. Even if viewed as a matter of first impression, this construction would seem untenable, since the usual accepted meaning of the term "counterfeited" simply does not mean fraudulent or fictitious, and it is difficult to believe that experienced business people would have understood from the word "counterfeited" that they had secured insurance protection with regard to every transaction in which money was paid out on the basis of a document that purported to describe a transaction that never occurred. Considered in light of the well-established judicial interpretation in effect at the time the blanket bond here was entered into, the court's conclusion is not easy to understand.

In *Exchange Natl. Bank of Olean v Insurance Co. of N. Am.* (341 F2d 673, *cert denied* 382 US 816) the Second Circuit (per Marshall, J.) set forth, in 1965, what has become uniformly accepted as the correct construction of the term "counterfeited" as used in the instrument with which we are concerned. The court said (at p 676): "A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception. These distinctions are recognized in ordinary and commercial usage and they are preserved in the bond."

In the 21 years that have passed since the *Olean* decision *(supra),* every court to address the issue, including the Fourth Department in this State, has adopted the *Olean* construction.

*(See, e.g., State Bank v Hanover Ins. Co.,* 49 Misc 2d 341, *affd* 25 AD2d 618; *Richland Trust Co. v Federal Ins. Co.,* 494 F2d 641; *Whitney Natl. Bank v Transamerica Ins. Co.,* 476 F2d 632; *Capitol Bank v Fidelity & Cas. Co.,* 414 F2d 986; *Liberty Natl. Bank v Aetna Life & Cas. Co.,* 568 F Supp 860, 864; *Hinkson v Fireman's Fund Ins. Co.,* 84 Cal App 3d 232, 146 Cal Rptr 669.)

It is misleading to suggest that this court is confronted with a division of judicial authority between one group of cases taking the "restrictive" view (presumably bad) and another group following the more "expansive" interpretation (presumably good). The three decisions referred to in the court's opinion as supporting the "expansive" view were decided before (then) Judge Thurgood Marshall's decision in *Olean (supra).* The court's opinion fails to cite a single decision since *Olean* that interprets the word "counterfeited" in the standard bond in accordance with the interpretation here advanced.

The court's opinion relies in large part on this court's earlier decision in *Prudential Capital Corp. v Royal Indem. Co.* (21 AD2d 664) a case decided prior to the *Olean* decision and the judicial consensus on the issue that thereafter developed. Notably, this court's memorandum opinion in *Prudential Capital Corp. (supra),* relied in turn on *Fidelity Trust Co. v American Sur. Co.* (268 F2d 805), a Third Circuit decision that was explicitly overruled by that court in *Whitney Natl. Bank v Transamerica Ins. Co.* (476 F2d 632, *supra).* Reviewing the overwhelming authority that had developed subsequent to its prior decision, the Third Circuit concluded (at p 635): "The cited cases constitute impressive authority contrary to our earlier decision. We are persuaded that they are soundly reasoned. Accordingly, we no longer will follow Fidelity Trust Co. v. American Surety Co."

I would have thought that the definition of the word "counterfeited" introduced in the revision of the blanket bond in 1969 eliminated any possible doubt as to the construction of that term. When that definition is read in light of the body of judicial authority at the time the definition was introduced, it seems to me clear beyond any possible doubt that its intent was to incorporate explicitly the interpretation that had been adopted by the Second Circuit in *Olean (supra). (See, Hinkson v Fireman's Fund Ins. Co., supra,* at pp 671-672; *Liberty Natl. Bank v Aetna Life & Cas. Co., supra,* at p 864, n 3.) I think it untenable to suppose that the insurance industry added the

definition of the word "counterfeited" in the revision of the standard bond in 1969 in order to overthrow the interpretation of that word established in *Olean* and the later decisions, and in a curious effort to expand substantially its liability under the bond.

In light of the foregoing analysis, and the fact that there may be some transactions involving documents that were not forged, it would be erroneous at this time to strike the fourth, fifth and sixth affirmative defenses.

Accordingly, the order of the Supreme Court, New York County (Alvin F. Klein, J.), entered on May 6, 1985, which denied defendant's motion for summary judgment, denied plaintiff's cross motion to dismiss the fourth, fifth and sixth affirmative defenses, and granted plaintiff's cross motion to dismiss the seventh affirmative defense, should be affirmed.

KUPFERMAN, J. P., and Ross, J., concur with MILONAS, J.; SANDLER and ASCH, JJ., dissent in part in an opinion by SANDLER, J.

Order, Supreme Court, New York County, entered on May 6, 1985, modified, on the law, to the extent of granting plaintiff's cross motion to dismiss the fourth, fifth and sixth affirmative defenses, and otherwise affirmed, without costs and without disbursements.