**FRENCH AMERICAN BANKING CORP., Plaintiff,**

v.

**FLOTA MERCANTE GRANCOLOMBIANA, S.A., and Fireman's Fund Insurance Co., Defendants.**

**No. 83 Civ. 5095 (KTD).**

United States District Court, S.D. New York.

Sept. 10, 1990.

See also 693 F.Supp. 1421.

Cleary, Gottlieb, Steen & Hamilton, New York City (Edwin B. Mishkin, Deborah M. Buell, Peter J. Mozarsky, of counsel), for plaintiff.

Kroll & Tract, New York City (Jerome Murray, Michael Maillet, Joel M. Ross, Stephen Ungar, of counsel), for defendant Fireman's Fund Ins. Co.

1. By stipulation between the parties, all claims against defendant Flota Mercante Grancolombiana, S.A., were dismissed from this action with prejudice.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff French American Banking Corporation ("FABC") brings this diversity action seeking to recover approximately $4 million, plus accrued interest, from defendant Fireman's Fund Insurance Company ("Fireman's") under a Banker's Blanket Bond ("Bond") issued by Fireman's to FABC. FABC alleges that it incurred that loss as a result of loan made to Colombian Coffee Company ("CCC") on the faith of certain ocean bills of lading for coffee shipments issued by Flota Mercante Grancolombiana, S.A. ("Flota")[1] and pledged to FABC in connection with amounts FABC loaned CCC. FABC contends that these bills of lading were both "forgeries" and "counterfeits" under Insuring Agreement (E) of the Bond, which provides coverage for losses resulting from an insured bank's good faith extension of credit in reliance on a counterfeit or forged security or document of title. Fireman's contends that the bills of lading were neither forged nor counterfeit under the Bond and further asserts two affirmative defenses: (1) that FABC did not give timely notice of its claim under the Bond; and (2) that a "risk-only" participation agreement between FABC and its sister company BNP–Panama reduces the amount by which FABC can recover from Fireman's to half the loss.

A non-jury trial was held before me on May 22 through May 25, 1989. The following constitutes my findings of fact and conclusions of law after consideration of all the evidence and exhibits presented.

## FACTS

The facts in this case have been detailed in four prior Memorandum and Orders and will be repeated only as necessary here.[2]

FABC, a subsidiary of the Banque Nationale de Paris ("BNP"), is a New York

2. Those Memorandum and Orders are dated May 24, 1984, April 29, 1985, April 8, 1987, and August 23, 1987.

investment company under Article XII of the New York Banking Law. It is engaged in the banking business, specifically, the lending of money to commercial borrowers. Fireman's is a California corporation engaged in the insurance business, including the issuance of Bankers Blanket Bonds.

At all relevant times, there was in effect a Banker's Blanket Bond, on Standard Form 24, issued by Fireman's as insurer in favor of FABC as insured, with a limit of liability of $10 million and a deductible of $100,000. *See* Joint Trial Exh. ("JTE") 68. By its terms, the Bond covers a loss, in appropriate circumstances, resulting from FABC having, in good faith, acquired a "Document of Title" which is "Counterfeit" or which bears a signature which is a "Forgery."

In January 1981, FABC extended to CCC an $8 million line of credit to finance the importation of coffee from Colombia. CCC is a New York corporation engaged in the business of selling coffee to roasters, primarily roasters in the United States. Most of the coffee that CCC imported was purchased by it from an affiliated company Luis A. Duque Pena E. Hijos, Ltda. ("Duque Ltda."). CCC was the United States importing arm of Duque Ltda. and, like Duque Ltda., was owned and/or controlled by the Duque family. For the most part, the coffee was transported by truck to Colombian ports, where it was loaded onto ships, including ships owned by Flota. The ocean bills of lading, which were issued by Flota once the coffee was on board, would then be forwarded by Duque Ltda. to CCC in New York, which used them to obtain financing from banks such as FABC. Financing was made available for the inland portion of the shipments as well as the transportation of the coffee from Colombian ports to the United States.

When FABC opened the credit facility for CCC, it also entered into a Risk Participation Agreement (the "Participation Agreement"), with the Banque Nationale de Paris, Panama ("BNP Panama"), an affiliate of BNP. Pursuant to the Participation Agreement, BNP Panama agreed to have a fifty-percent "risk-only" participation in the risk of the CCC facility; FABC would participate in the remaining fifty percent of the risk.

FABC provided financing with respect to the oceangoing portion of the shipments for 100 percent of the coffee value. Typically, a representative of CCC would deliver duly endorsed bills of lading to FABC. FABC agreed to forward the bills of lading to CCC in return for trust receipts. CCC agreed to hold the bills and the coffee covered thereby in trust for FABC and subject to FABC's security interest pursuant to Uniform Commercial Code ("UCC") § 9–304(5), thereby permitting CCC to arrange for receipt and delivery of the coffee to a buyer. CCC further agreed to account to FABC by delivering to FABC, immediately upon receipt, the proceeds of the sale of the coffee. In addition, FABC had a duly filed security interest in CCC's inventory and receivables. Agreed Fact 14. Prior to July 1982, FABC supplied financing to CCC under a line of credit both against the pledge of negotiable order ocean bills of lading covering coffee shipped from Colombia and against the pledge of non-negotiable inland bills of lading issued by a trucking company in Colombia.

In July 1982, Banco Nacional, a Colombian bank, collapsed, causing liquidity problems for the Duque interests in Colombia. CCC thereafter informed FABC that it diverted to Duque Ltda. in Colombia approximately $1 million in trust receipt proceeds owing to FABC. Agreed Fact 15. FABC then decided to supply new financing only against the pledge of non-negotiable ocean bills of lading and only on an *ad hoc* basis. Agreed Fact 15.

On July 15, 1982, CCC owed FABC $9.3 million. Between July and mid-November 1982, CCC reduced that indebtedness to $4.4 million and supplied additional collateral. Agreed Fact 16. Of the $4.9 million reduction, CCC made a $2 million cash payment to FABC and supplied current bills of lading for $1.8 million for shipments to Germany and Japan to secure the existing indebtedness owed against overdue trust receipts.

In November 1982, FABC agree to finance a single pre-sold coffee shipment to the United States for $2 million against receipt of seven ocean bills of lading presented by CCC. JTE 22–25. FABC asserts that its decision to provide financing in this instance was based on CCC's progress in reducing its indebtedness and CCC's plan to negotiate with another bank, Banque Worms, for a $5–10 million line of credit. The bills of lading were surrendered by FABC for trust receipts. The documents were on Flota's printed forms and appeared to FABC to be full sets of valid original negotiable order ocean bills of lading of Flota. Agreed Fact 18, Tr. 41–42. The value of the coffee purportedly covered by these bills of lading exceeded $2 million. Agreed Fact 19. It would later be discovered that these bills of lading were false documents created by the Duques, or others working on their behalf, and reflected either coffee shipments that had previously been shipped under previously issued valid bills or fictitious shipments. Agreed Fact 18.

At the time of the financing and pledge, CCC executed, endorsed, and delivered to FABC three sixty-day sight drafts, due January 17, 1983, in the amounts of $1.4 million, $400,000, and $200,000, which then were accepted by FABC, thereby becoming bankers acceptances. Agreed Fact 20. After receiving the bills of lading and the sight drafts, FABC immediately exchanged the purported bills of lading for trust receipts, due January 17, 1983.

By late December 1982, CCC had reduced its outstanding indebtedness to FABC of $4.4 million by $450,000 and supplied additional collateral for the remaining outstanding amount. Agreed Fact 23. These loans were secured by $1.8 million in current bills of lading and approximately $2.2 million in current trust receipts.

On December 22, 1982, FABC agreed to finance, against bills of lading, another specific shipment of coffee to the United States in the amount of $1.3 million. Financing was conditioned on CCC first supplying ocean bills of lading to cover coffee worth $537,000 that was previously financed but which was covered only by inland bills of lading, and on CCC paying $880,000 that was due on existing trust receipts. Agreed Fact 24. On December 30, 1982, CCC paid the $880,000 and delivered the two ocean bills of lading to cover most of the unaccounted-for coffee. However, because the bills of lading covering the shipment for which FABC was going to extend $1.3 million were for a shipment to Japan rather than the United States, as was originally agreed, and one was not signed, FABC refused to make the $1.3 million loan. Agreed Fact 24.

On December 30, 1982, in anticipation of the expected $1.3 million advance from FABC, CCC had already drawn on and delivered a check for $653,000 to another bank, Societe General. FABC advanced $650,000 to CCC on January 3, 1983, to cover the check to Societe General against the pledge by CCC to FABC of three ocean bills of lading. JTE 27–29. Agreed Fact 24–25. Those bills of lading appeared to FABC to be facially valid original bills of lading of Flota, but again proved to be false documents created by the Duques. Agreed Fact 26. The value of the coffee purportedly covered by these bills was approximately $1 million. Agreed Fact 27.

On January 13, 1983, at a meeting between officers of CCC and FABC, CCC advised FABC that it would, the next day, apply the $1.8 million secured by the bills of lading that had been pledged to FABC in November. On January 14, 1983, CCC paid FABC the $1.8 million. Agreed Fact 28.

On January 17, 1983, CCC paid the three sight drafts issued by CCC to FABC on November 18, 1982, by a check for $2 million made payable to CCC, endorsed to FABC, and drawn by General Coffee Corporation, a corporation under common control with CCC, on Royal Trust Bank N.A., in Miami, Florida. Agreed Fact 30. FABC, by inquiry to Royal Trust Bank, determined that, at that time, there were insufficient funds in General Coffee's account to cover the check. FABC nevertheless caused the check to be sent forward through normal bank collection channels for collection. Agreed Fact 31.

On January 18, 1983, FABC advanced $3 million to CCC and CCC presented to FABC ten purported bills of lading. JTE 34–40–C. The documents again appeared to FABC to be full sets of valid original negotiable order ocean bills of lading of Flota. Agreed Fact 33. Again, the bills of lading proved to be false. The value of the coffee purportedly covered by said bills of lading was at least $3,107,000. Agreed Fact 34. FABC and CCC agreed that $2 million of this loan was to be applied to cover the $2 million check of General Coffee given by CCC to FABC, and that CCC would cause General Coffee to stop payment on the check. Agreed Fact 35.

Between January 18 and the end of April 1983, CCC reduced its indebtedness by another $818,000, and in April 1983 presented its various banks, including FABC, with a refinancing proposal. Agreed Fact 37.

In May 1983,[3] FABC presented to Flota the bills of lading accepted by FABC in connection with the $650,000 and $3 million loans, JTE 27–29, 34–40–C, made in January 1983, and Flota denied that said bills of lading were valid. Agreed Fact 40. On May 13, 1983, FABC commenced an action against CCC and others in the Supreme Court of the State of New York. On May 18, 1983, FABC first notified Fireman's of its alleged loss. Agreed Fact 43. Thereafter, on July 8, 1983, FABC commenced the present action against Flota alone. During this time, FABC was participating in bankruptcy proceedings in Florida involving the Duque group. On August 10, 1983, FABC submitted its proof of loss to Fireman's. Following additional correspondences between the parties, Fireman's, by letter dated December 2, 1983, informed FABC that it could not acknowledge liability.

After the default, pursuant to its Risk Participation Agreement with BNP Panama, FABC requested that BNP Panama make a deposit with FABC in an amount equal to fifty percent of FABC's losses, or $2,063,000. BNP Panama made the requested deposit. This arrangement permits FABC's earnings in relation to other BNP units to reflect more fairly the ultimate allocation of risks among those units. The deposit was treated by FABC as a non-interest bearing deposit account in the name of BNP–Panama. Agreed Fact 44.

By Memorandum and Order dated May 24, 1984, I granted FABC's motion to add Fireman's as a defendant. On May 30, 1984, FABC filed an Amended Complaint that included claims against Fireman's for its loss allegedly resulting from its receipts of three bills of lading in December 1982, and ten bills of lading in January 1983, all of which proved fictitious. In its Second Amended Complaint, FABC also seeks to recover for its loss arising from its receipt of the seven bills of lading in November 1982.[4] In addition to seeking recovery in an amount equal to the alleged value of the coffee represented by the bills of lading, FABC also claims that, in reliance on the bills of lading, it refrained from requiring payment of prior outstanding loans in the amount of $475,000.

## DISCUSSION

Fireman's is the insurer under a Bankers Blanket Bond issued to FABC. The Bond is on Standard Form 24, Revised to July 1980, promulgated by an association of insurers, the Surety Association of America. FABC's claims against Fireman's are predicated on Insuring Agreement (E) of the Bond covering "Securities." The policy insures FABC for:

> [A] loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1) acquired, sold or delivered, or given value, extended credit or assumed lia-

---

**3.** By May 1983, CCC owed FABC $457,000 in principal amount over and above the loans made by FABC to CCC in November 1982 and January 1983. The $457,000 balance represents the balance due on a coffee financing of $849,000 entered into on May 17, 1982. In October 1982 and May 1983, FABC received payments that reduced the amount outstanding under that advance to $457,000. Agreed Fact 42.

**4.** FABC also claimed damages for Fireman's alleged bad faith in processing FABC's claim. By Memorandum and Order dated April 29, 1985, I granted Fireman's motion to dismiss that claim.

bility, on the faith of, or otherwise acted upon, any original

    (a) Security,

    (b) Document of Title, ... which

    (i) bears a signature ... which is a Forgery, or

    (ii) is altered, or

    (iii) is lost or stolen;

    . . . .

(3) acquired, sold, or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.[5]

JTE 68. "Documents of Title" is defined in the bond as including a bill of lading. Thus, in order to recover under the Bond, FABC must show a loss of $4,107,000 resulting directly from FABC having given value against original bills of lading, in good faith, which bills of lading were "forged" and/or "counterfeit." Because I find the issue of whether the bills of lading were forged or counterfeit to be dispositive, that issue will be considered first.

### Forgery

■ FABC contends that its loss is covered under the "forgery" and "counterfeit" coverage of Insuring Agreement (E) of the Bond. Insuring Agreement (E) defines forgery as follows:

Forgery means the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose.

JE 68, § 1(h).

Flota at all relevant times was represented by Trnasportadora Grancolombian Limitada ("Transportadora") at the Colombian ports of Buenaventura, Boranquilla and Santa Maria. In 1982 and 1983, Transportadora's functions at Buenaventura included, among other things, the receipt and loading of cargo to be transported aboard Flota's ships and the preparation and issuance of the corresponding documentation, including Flota bills of lading. The parties agree that the signatures on the bills of lading issued by Transportadora on behalf of Flota were generally illegible, that there were no specimens on file or furnished to Flota's discharge port agents of persons authorized to sign such bills of lading, and, as new or different persons were authorized to sign, no notification of that fact, or specimens of the signatures, were furnished to Flota's port agents.

Each bill of lading issued by Transportada on behalf of Flota covering sacks of coffee contained not only a signature but also a number of stamp impressions placed thereon by Transportada which made one such bill of lading look much like another. The bills of lading accepted by FABC in connection with the November 18, 1982, January 3, 1983, and January 18, 1983 loans, JTE 22–25, 27–29, 34–40–C, were on the bill of lading forms customarily used by Flota and included the typical stamp impressions.

Fireman's argues that FABC, which bears the burden of proving a forgery, has not established that the illegible handwriting on the bills of lading in issue were the "signing of the name of another" or even that it is not "the signing of one's own name without authority." FABC did not present any evidence that establishes the identity of the person who prepared or

---

**5.** Pursuant to the 1980 Form of the Bond, the Bond does not cover losses which involve the non-payment of a loan or loan-type transactions, notes, accounts, invoices etc. There are three exceptions to these "loan-type" exclusions under the Bond: if a loss results from the dishonest acts of an employee (Insuring Agreement (A)), from certain activities which involve forged or altered instruments (Insuring Agreement (D)), or from certain transactions involving forged, altered, lost, stolen, or counterfeit securities (Insuring Agreement (E)). The rationale behind the loan-type exclusion is that the making of loans is the business of the bank and part of its business risk. E. Neel, Financial Institution and Fidelity Coverage for Loan Losses, 21 Tort & Ins. L.J. 590, 593 (Summer 1986). Courts have noted that a bankers blanket bond is not "a form of credit insurance." *Liberty Nat'l Bank v. Aetna Life & Casualty Co.*, 568 F.Supp. 860, 866 (D.N.J.1983). The Bond's language attempts to distinguish between risks against which the banks could reasonably protect themselves through, for example, diligence in screening and approving loans, and risks which commercial realities indicate that the banks should not assume. *Id.*

signed the bills of lading in issue. Indeed, neither FABC nor Fireman's knows who signed the bills, or whether or not the signer signed his or her name, either with or without authority. Nor is there affirmative evidence that the signer signed the bills of lading with the intent to deceive, although that may be inferred from the circumstances. Indeed, FABC has not proved that the illegible scribble on the bills of lading in issue is someone's signature.

It appears that the handwriting on all the fictitious bills were made by the same person and represent the same, albeit illegible, name. Plaintiff's Trial Exh. 195, Osborn Affid. of January 1988 ¶ 17. If the person who affixed the handwriting to the bills of lading in this case attempted to simulate the signature of a known signatory it could constitute a forgery. However, FABC and its expert agree that the handwriting does not appear to be, or appear to purport to be, that of any person authorized by Flota as signatories, nor that of any known person. Agreed Fact ¶ 4; Osborn Affid. of June 1987 ¶¶ 15–16.

FABC argues that since the handwriting is unidentifiable as that of someone known to either FABC or Fireman's, it is reasonable to assume that the name is that of a fictitious person. However, it is equally plausible that the signer signed his own name or did not sign a name at all, but merely made an illegible scribble. *See Loeb Partners v. Hartford Acc. & Indem. Co.*, N.Y.L.J., Aug. 2, 1984, p. 4, Col. 1

(Sup.Ct., N.Y.Co.1984) (the illegibility of a purported signature and the absence of any evidence as to who affixed it or what it was supposed to represent raised "serious issues of fact" as to a claim of forgery). It is also possible that the scribble is the actual signature of an unauthorized person, or a disguised signature adopted by an authorized person. FABC has thus not sustained its burden of proving a "forgery" under the Bond. *Cf. William Iselin & Co. v. Fireman's Fund Ins. Co.*, 117 A.D.2d 86, 501 N.Y.S.2d 846 (1st Dep't 1986), *ctfd. ques. ans.*, 69 N.Y.2d 908, 516 N.Y.S.2d 198, 508 N.E.2d 932 (1987) (stamped printed signatures on bills of lading of "Lawson Trucking Co., Inc., J. Lawson, President" were "forged as to signature" where it was shown that the stamp was being utilized without the knowledge or consent of J. Lawson).

FABC's reliance on New York criminal law to establish that the "signatures" on the bills of lading are forgeries is misplaced. *See Allied Bank Int'l v. Fireman's Fund Ins. Co.*, NYLJ, Aug. 11, 1988, p. 18, col. 2 (Sup.Ct.N.Y.Co. Aug. 3, 1988), *aff'd without op.*, 151 A.D.2d 1056, 544 N.Y.S.2d 264 (1st Dep't 1989).[6] Because of the plain meaning of the Bond language defining forgery, the only relevant definition of forgery is that contained in the Bond and cases construing that definition. *Id.* Under the Bond, coverage is limited to documents that are forged *as to signature*.[7] Even under the criminal law

---

**6.** I have already found that the rule of *contra proferentum*, which, in appropriate circumstances, would require that ambiguities in a policy of insurance be construed against the insurer, is a rule of last resort and thus not applicable here. *French American Banking Corp. v. Flota Mercante Grancolombiana, S.A.*, 609 F.Supp. 1352, 1356 n. 4 (S.D.N.Y.1985) (citing *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n. 2 (2d Cir.1983)). Furthermore, application of the rule would be inappropriate here because the Bond was not drafter by Firemans', but is on a standard form of the American Surety Association, the terms of which are negotiated with the American Bankers Association. *Shearson/American Express, Inc. v. First Continental Bank & Trust Co.*, 579 F.Supp. 1305 (W.D. Mo.1984).

**7.** FABC's reliance on *Filor, Bullard & Smyth v. Ins. Co. of North America*, 605 F.2d 598 (2d Cir.1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1506, 59 L.Ed.2d 776 (1979) for the proposition that the definition of forgery under New York law is ambiguous, and therefore the term "forgery" as used in the Bond must be construed against Fireman's, is misplaced. That case held that "forgery" in a broker's blanket bond was ambiguous. The Second Circuit then construed that term against the insurer and found an unauthorized signature to constitute a "forged" signature. The Second Circuit hinged its finding of ambiguity on a revision to the New York penal law in 1967 that expanded the definition of forgery to include "writings unauthentic because not authorized." *Id.* at 603. However, *Filor, Bullard* involved bonds that did not define forgery. Here, the Bond expressly provides that

of New York,[8] the signing of a fictitious or assumed name alone does not constitute a forgery. *People v. Johnson*, 96 A.D.2d 1083, 466 N.Y.S.2d 969 (2d Dep't 1983), *aff'd mem.*, 63 N.Y.2d 888, 472 N.E.2d 1029, 483 N.Y.S.2d 201 (1984). It must be shown that the name was used for the purpose of falsely representing that the person who signed the document was a "person wholly separate and apart from himself." *Id.*, 466 N.Y.S.2d at 970. "[T]he courts have distinguished forgery from mere fraud involving the use of an instrument requiring that the victims have intended to extend credit in reliance upon the maker's *signature*, i.e., upon the existence of the ostensible rather than the actual author." *Id.* at 972 (O'Connor, J., dissenting in part and concurring in part). Although it is undisputed that FABC believed the bills of lading to be valid, and it is reasonable to infer that the bills were signed for the purpose of deception or fraud, fraud alone does not necessarily constitute forgery under the Bond or even under the penal law of New York.

Nor is FABC's reliance, by analogy, on the Uniform Commercial Code ("UCC") persuasive. FABC argues that the UCC treats the signature of a fictitious person as a forgery. Aside from the fact that FABC has not provided any proof that the "signature" on the bills of lading is that of a fictitious person, under UCC § 3–405, an endorsement in the name of a fictitious payee is not a forgery; it is an ineffective indorsement. Moreover, a signature under the UCC may be in an assumed name, "since the existence or nonexistence of the named payee is not decisive." § 3–405, Comment 1. Because the fictitious payee rule is not applicable unless the check is endorsed in the name of the named payee,

when the check is endorsed, the handwriting is meant to be the name of the person known to be fictitious. § 3–405(1) and Official Comment 1. An "unauthorized' signature or indorsement under the UCC "means one made without actual, implied or apparent authority and includes a forgery." § 1–201. Thus this definition recognizes that "forged" is a narrower concept than "unauthorized." The terms are not functional equivalents; "unauthorized" signatures includes those that have been "forged," while "forged" does not include all "unauthorized" signatures.

FABC also points to a companion case growing out of the CCC fraud, to support its claim that the bills were forged or counterfeited. In *Societe Generale v. Federal Insurance Co.*, 856 F.2d 461 (2d Cir.1988), involving a bank's identical claims of forgery and counterfeit on a Bankers Blanket Bond, the jury found, via special verdict form, that the bills had been "forged" or "counterfeited." However, Judge Sand had specifically instructed the jurors that they could reach that conclusion only if they determined that the bills had been "signed by a person who signed a name other than his own and . . . who was not an employee of Flota or an authorized representative of Flota." Defendant's Trial Memo. of Law, Exh. C. Here there is no basis upon which I could find that the instant bills were "signed by a person who signed a name other than his own."

Moreover, I find that FABC's losses are not covered under the forgery provision of Insuring Agreement (E) of the Bond because the losses did not directly result from the purported forgery. The language of the Bond is clear that in order for FABC to recover, the claimed loss must have re-

---

forgery "does not include signing one's own name with or without authority, in any capacity, for any purpose." Moreover, *Filor, Bullard* is no longer valid even with respect to the criminal law of the forgery in New York. *People v. Levitan*, 49 N.Y.2d 87, 424 N.Y.S.2d 179, 399 N.E.2d 1199 (1980).

**8.** A person is guilty of forgery under New York law when with intent to defraud, deceive or injure another, such person falsely makes, completes or alters a written instrument. *See* N.Y.

Penal Law § 170.05 (McKinney 1988). A person "falsely makes" a written instrument when

> he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.

N.Y. Penal Law § 170.00(4).

sulted directly from FABC, in good faith, having given value against bills of lading which "bears a signature which is a Forgery." JTE 68. In a similar action in which a bank sought to recover under a bankers blanket bond for losses from loans secured by worthless certificates of deposit ("CD's"), the court held that even if the CD's were counterfeits and forgeries, the bank's loss was not caused by the lack of authenticity or genuineness of the documents, but by the fact that the statements contained in the documents were not true. *Liberty Nat'l Bank v. Aetna Life & Cas. Co.*, 568 F.Supp. 860, 863 (D.N.J.1983). The court noted that "[i]f the documents were authentic and their signatures genuine and authorized, the loss nonetheless would have occurred." *Id.* The court concluded that, by the terms and intent of the Bond, the loss fell upon the bank because the "failure of the security was not because they were counterfeit or forged, but solely because the assets purportedly represented thereby were nonexistent." *Id.*

Here, FABC's losses resulted not from the purported forgeries but from the Duque's fraudulent scheme. FABC did not know who the authorized signatories of Flota were; FABC could not read the scribble on the bill of lading and had no idea whose name was purported to be represented thereby. Even if the signatures had been identifiable and genuine, the bills still represented non-existent or previously completed transactions and FABC would have still suffered losses identical to those they now face. *See Reliance Insurance Co. v. Capital Bancshares, Inc./Capital Bank*, 685 F.Supp. 148 (N.D.Tex.1988) (where bank would have suffered same loss even if forged signature on bogus stock certificates had been genuine, loss not covered by bankers' blanket bond). Because the losses are not the direct result of FABC having "extended credit" or "otherwise acted" on the faith of the "signatures" on the bills of lading, those losses are not within the scope of Insuring Agreement (E) of the Bond.

*Counterfeit*

■ Section 1(d) of the Bond defines "Counterfeit" as follows:

Counterfeit means an imitation which is intended to deceive and to be taken as an original.

The close similarity between the fake bills and authentic Flota bills of lading is undisputed. The fake bills were created on actual Flota forms, employed actual Flota stamps, and appeared to FABC to be valid Flota bills. Fireman's contends, however, that because each of the bills of lading is itself an original document, and is neither an imitation of an original document or an imitation intended to be taken as an original, they are not "counterfeit" as defined under the Bond.

Both FABC and Fireman's agree that *Exchange National Bank v. Ins. Co. of North America*, 341 F.2d 673 (2d Cir.1965), *cert. denied*, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965), is the leading case in this circuit on the issue of "counterfeit" under the Bond. That case involved determination of whether genuinely issued but false invoices were counterfeits under Insuring Agreement (E) of the Bankers Blanket Bond. The borrower had assigned accounts receivable as collateral and, as evidence of the accounts, had submitted false but genuinely signed invoices showing shipments not yet completed at the time the loan were made. The Second Circuit held the invoices were not "counterfeit," stating:

A document or writing is counterfeit if it is an imitation, if it attempts to simulate another document or writing which is authentic. The deceptive and fraudulent quality of these invoices, however, arose, not from the effort to imitate or simulate authentic invoices, but from falsity of the implicit and explicit representations of fact, to wit, that certain goods had already been shipped to a customer. To hold that these invoices are counterfeit would obliterate elementary distinctions among the techniques of deception.

341 F.2d at 676.

The court thus distinguished between documents that are genuinely created but that contain false statements and mislead by their content, which are fraudulent but

not counterfeit, and documents that are not created by the purported issuing party and thereby mislead by the fact of their issuance, which are counterfeit. 341 F.2d at 676.[9]

Ever since the decision in *Exchange Nat'l Bank*, courts have uniformly held that a document which is fraudulent, but which does not attempt to simulate another genuine document, is not a counterfeit under a Banker's Blanket Bond. *See, e.g., Bank of Southwest v. National Surety Co.*, 477 F.2d 73 (5th Cir.1973); *Capitol Bank of Chicago v. Fidelity and Casualty Co.*, 414 F.2d 986 (7th Cir.1969); *Liberty Nat'l Bank v. Aetna Life & Casualty Co.*, 568 F.Supp. 860 (D.N.J.1983); *Richardson Nat. Bank v. Reliance Ins. Co.*, 491 F.Supp. 121, 123 (N.D.Tex.1977), *aff'd*, 619 F.2d 557 (5th Cir.1980); *National City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171 (Minn.1989) (en banc); *Hinkson v. Fireman's Fund Ins. Co.*, 146 Cal.Rptr. 669, 84 Cal.App.3d 232 (1978); *Gateway State Bank v. North River Ins. Co.*, 387 N.W.2d 344 (Iowa 1986); *State Bank of Kenmore v. Hanover Ins. Co.*, 49 Misc.2d 341, 267 N.Y.S.2d 672 (1965), *aff'd*, 25 A.D.2d 618, 269 N.Y.S.2d 388 (4th Dep't 1966).

FABC argues that the distinction made in *Exchange Nat'l Bank* between types of misrepresentations favors finding the instant bills of lading to be counterfeit in that the relevant misrepresentation goes to the authenticity or genuineness of their execution. I find, however, that the misrepresentations upon which FABC relied concerned not the genuineness of execution of the bills but the existence of the underlying shipments. "Counterfeit means the imitation of an instrument that is authentic such that a party is deceived on the basis of the quality of the imitation." *Capitol Bank of Chicago v. Fidelity & Casualty Co.*, 414 F.2d 986, 989 (7th Cir.1969). Here, as in *Capital Bank*, the bank was defraud-

ed not by the similarity of the documents in issue to authentic ones, but because the underlying transactions did not take place. As the Second Circuit found in *Exchange Nat'l Bank*, the risk of fraudulent documents must be borne by the bank:

> There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within the purview of the bond, and extending credit on the basis of invoices that cover nonexistent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.

341 F.2d at 676, *C.f. Reliance Insur. Co. v. Capital Bancshares, Inc./Capital Bank*, 685 F.Supp. 148 (N.D.Tex.1988) (stock certificates not counterfeit under Bankers Blanket Bond because did not imitate genuine existing originals).

The leading New York State case applying *Exchange Nat'l Bank* further supports the finding that the bills of lading in issue are not "counterfeits" under the Bond. *William Iselin & Co. v. Fireman's Fund Ins. Co.*, 117 A.D.2d 86, 501 N.Y.S.2d 846 (1st Dep't 1986), *ctfd. ques. ans.*, 69 N.Y.2d 908, 508 N.E.2d 932, 516 N.Y.S.2d 198 (1987). In *Iselin*, the plaintiff entered into an accounts receivable financing, or "factoring," agreement with W.C. Lawson Cotton Co. under which plaintiff made advances to Lawson based on Lawson's accounts receivable. It was later discovered that Lawson had defrauded plaintiff by means of assigning forged bills of lading, bearing an unauthorized stamped signature of the carrier, and invoices bearing a genuine signature but which recited nonexistent sales of goods. Plaintiff sued its insurer under its Bankers Blanket Bond. The ma-

---

9. Insuring Agreement (E) was amended in 1969 to add a specific definition of "counterfeit" in response to inconsistent interpretations of "counterfeit" in the courts. *National City Bank*, 447 N.W.2d at 178–79; *see also Iselin*, 117 A.D.2d at 92, 501 N.Y.S.2d at 850. The holding

in *Exchange Nat'l Bank* is representative of the majority view extant before the 1969 amendment, which required an imitation of a genuine original document to constitute a "counterfeit" under the Bond.

jority opinion of the Appellate Division, First Department, held that the term "counterfeit" covered not only the bills of lading, on which the unauthorized stamped signature appeared, but also the invoices containing a genuine signature but which misrepresented facts regarding the underlying transactions. The majority concluded that a counterfeit under the Bankers Blanket Bond includes " 'something that purports to be something that it is not.' " 501 N.Y.S.2d at 849 (quoting *Fidelity Trust Co. v. American Surety Co.*, 268 F.2d 805, 807 (3d Cir.1959)).[10] The majority decision did note, however, that while "it might make sense, in dealing with the banking industry, to restrict the definition of "counterfeited" to an attempt to imitate or simulate another document which is authentic ..., the situation is quite different where an insurance company chooses to issue the same standard Bankers Bond in connection with factoring arrangement." 501 N.Y. S.2d at 851.

Justice Sandler, in dissent, agreed with that portion of the majority's opinion finding the bills of lading containing the forged signatures to be counterfeit under the Bond. However, he found that the invoices not containing forged signatures but merely containing misrepresentations of fact were not "counterfeit" under the Bond, even though those invoices were "frequently exact handwritten duplications of previously assigned invoices," 117 A.D.2d 86, 501 N.Y.S.2d at 847, and "imitate[d] prior invoices and delivery documents representing real accounts and customers." *Id.* 501 N.Y.S.2d at 850.

He stated:

> [The court majority now holds that the word "counterfeit" as used in the insuring agreement in fact means fraudulent or fictitious and embraces any apparently authentic instrument which purports to describe a transaction that did not in fact take place. Even if viewed as a matter of first impression, this construction would seem untenable, since the usual accepted meaning of the term

"counterfeited" simply does not mean fraudulent or fictitious, and it is difficult to believe that experienced business people would have understood from the word "counterfeited" that they had secured insurance protection with regard to every transaction in which money was paid out on the basis of a document that purported to describe a transaction that never occurred. Considered in light of the well-established judicial interpretation in effect at the time the blanket bond here was entered into, the court's conclusion is not easy to understand.

501 N.Y.S.2d at 851.

Justice Sandler further found that the definition of "counterfeit" under the Bond, which was first introduced during revision of the Bond in 1969, when "read in light of the body of judicial authority at the time the definition was introduced, it seems to me clear beyond any possible doubt that its intent was to incorporate explicitly the interpretation that had been adopted by the Second Circuit in [*Exchange National Bank of*] *Olean* [*v. Insurance Company of North America*, 341 F.2d 673] [ (2 Cir. 1965) ]." 501 N.Y.S.2d at 852. The Court of Appeals adopted the dissent's view that the invoices not containing forged signatures but representing nonexistent transaction were not ."counterfeit" under the Bond.

FABC relies on the fact that in *Iselin* both the majority and dissenting justices in the Appellate Division agreed that the bills of lading that bore the unauthorized stamped signature of the carrier were both forged and counterfeit, even though those documents may have reflected nonexistent transactions. That holding, however, is grounded in the majority's finding that "while a forged instrument is necessarily a counterfeit, a counterfeit instrument need not always involve a forgery." 501 N.Y. S.2d at 849. Indeed, Justice Sandler's dissent makes clear that the finding of forgery was essential to its findings of counterfeit: "I do not agree with that part of the court's opinion which concludes that,

---

**10.** As conceded by the majority opinion, *Fidelity Trust Co.* was subsequently overruled in *Whit-*

*ney National Bank v. Transamerica Ins. Co.*, 476 F.2d 632 (3d Cir.1973).

*wholly without regard to the stamped signatures*, the documents were 'counterfeit.' " 501 N.Y.S.2d at 851 (emphasis added). Absent the forgery, in other words, there was no "counterfeit." As I have already found that the bills of lading in issue were not forged, a concomitant finding of "counterfeit" is not mandated by the holding of *Iselin.*

Here, it is undisputed that none of the bills of lading simulate an existing original document; there were never two identical sets of bills of lading, one genuine and one counterfeit. The information contained on the bills of lading was simply false. Flota did not receive the merchandise listed on the bills of lading. The facts before me are very similar to those of *Allied Bank Int'l v. Fireman's Fund Ins. Co.,* NYLJ, Aug. 11, 1988, p. 18, col. 2 (Sup.Ct.N.Y.Co. Aug. 3, 1988), *aff'd without op.,* 151 A.D.2d 1056, 544 N.Y.S.2d 264 (1st Dep't 1989), the only subsequent case construing *Iselin* to date. In *Allied Bank,* the plaintiff accepted bills of lading which contained "genuine" signatures, albeit of an unauthorized person, and false representations regarding goods which had never been shipped. The court held, relying on *Iselin,* that because there was no actual delivery of goods, the bills of lading were not imitations or simulations of other writings or documents which are authentic and thus are not counterfeits under the Bond. *See also Liberty Nat'l Bank,* 568 F.Supp. at 864 (worthless certificates of deposit were not counterfeit under Bankers Blanket Bond because they were issued by entity chartered as a foreign bank but which had no assets, and thus loss occurred because the CD's implicitly misrepresented facts of amounts available to issuing bank).

Also instructive is the holding of the Fifth Circuit in *Bank of The Southwest v. National Surety Co.,* 477 F.2d 73, 77 (5th Cir.1973). There, a bank loan was purportedly secured by a 1970 Cadillac, and the instrument surrendered was a Tax Collector's Receipt for Title Application No. V–460376, or "white slip." However, the genuine white slip No. V–460376 had been issued to a person other than the borrower and described not a 1970 Cadillac but a 1969 Mercury. The court held that the white slip "held by plaintiff was not an imitation of an authentic original document and was not 'counterfeit' within the coverage of Insuring Agreement E" because each of the bills of lading was itself an original document. I therefore conclude that because the bills of lading do not imitate a genuine, specific original they are not "counterfeits" under the Bond.

My findings with regard to both forgery and counterfeit are consistent with the purpose of the Bond, which is to equitably distribute the risks of doing business between the insurers and insured. As the Supreme Court of Minnesota noted:

> The basic rationale behind the definition of "counterfeit" is to require that an insurance company cover only non-business losses or insured risks, with a bank responsible for ordinary business losses.... An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control. The Bond is not intended to cover this type of forgery loss.

*Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.,* 447 N.W.2d 171, 179 (Sup.Ct. Minn.1989) (citation omitted). Moreover, there were clear grounds here for FABC to take especial care concerning the authenticity of the bills of lading. FABC was on notice of CCC's prior diversion of $1 million in funds owed to FABC to Duque interests in Colombia, CCC's bounced checks, and its cash flow difficulties. However, although several of the bills were outstanding many months after the purported coffee should have arrived, FABC made minimal or no effort to determine the existence, condition, or value of the coffee.

In sum, I find that the bills of lading in dispute are neither "forgeries" nor "counterfeit" under the Banker's Blanket Bond.

Accordingly, FABC's losses are not within the scope of Insuring Agreement (E) of the Bond and the complaint is dismissed in its entirety. Defendant is to submit judgment on five days notice within twenty days of the date of this order.

SO ORDERED.