KW BANCSHARES, INC., and Federal Savings Bank (formerly Federal Savings Bank, West Memphis), Plaintiffs,

v.

SYNDICATES OF UNDERWRITERS AT LLOYD'S, London Subscribing Policy G538944, Defendant.

No. 94–3081 M1/A.

United States District Court, W.D. Tennessee, Western Division.

Feb. 19, 1997.

Patrick M. Ardis, Wolff Ardis, Memphis, TN, for Plaintiffs.

Joseph T. Getz, Less Getz & Lipman, Memphis, TN, Jill S. Giroir, Strasburger & Price, Dallas, TX, Duncan L. Clore, Strasburger & Price, L.L.P., Dallas, TX, for Defendant.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McCALLA, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment, filed September 3, 1996. For the reasons set forth below, plaintiffs' motion is DENIED, and defendant's motion is GRANTED.

### BACKGROUND

The undisputed facts are as follows: On March 26, 1992, defendant issued a Savings and Loan Blanket Bond (No. 576/G53894400) ("bond") to KW Bancshares, Inc., and its wholly owned subsidiaries. Federal Savings Bank ("FSB") is one such subsidiary. Section 4 of the bond provides, "This bond ap-

plies to loss discovered [1] by the Insured during the bond period." The bond period was from March 26, 1992, until March 26, 1993. Section 2 of the bond provides:

This bond does not cover: ... (e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit ... whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E)....

Under Insuring Agreement (D), defendant agreed to indemnify plaintiffs for loss

resulting directly from: ... (2) transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices [2] directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed by any customer of the Insured or by any banking institution [3] but which instructions or advices either bear a signature which is a Forgery [4] or have been altered without the knowledge and consent of such customer or banking institution.

Under Insuring Agreement (E), defendant agreed to indemnify plaintiffs against loss

resulting directly from the Insured having, in good faith, for its own account or for the account of others, (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original ... (e) Security Agreement [5] which (i) bears a Forged signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity upon which the Insured relied.

The instant dispute arose out of the following transaction. On January 14, 1992, Morris Whitman, an executive vice president at National Mortgage Company ("NMC"), sought a $450,000 personal loan from FSB. Whitman assured FSB that he would repay the loan with proceeds from his annual bonus from NMC, which he claimed that he would be receiving on April 30, 1992, and that NMC would guaranty the loan. In connection with his request, Whitman submitted a personal financial statement dated June 10, 1991, which indicated that he had a personal net worth in excess of $106 million.

In February 1992, before FSB had acted on his loan request, Whitman informed FSB that he wanted to amend the loan request. Whitman proposed that, in lieu of NMC's guaranty, he would assign to FSB a portion of his bonus from NMC. In support of this proposal, Whitman submitted four documents to FSB via facsimile: (1) a "confidential memo" dated February 14, 1992, purportedly signed by Sam Margolin, President and Chairman of NMC, indicating that each board member at NMC would be receiving an annual bonus of $811,500; (2) a letter dated February 14, 1992, purportedly signed by Margolin, explaining that Whitman had been "a long-time, trusted leader" of NMC and had Margolin's "full support in any and all actions he deems necessary and that will be of help to him"; (3) a letter dated February 14, 1992, purportedly signed by Margolin, explaining that Margolin had "empowered [Whitman] to take charge of the day-to-day activities" at NMC; and (4) a letter dated February 21, 1992, purportedly signed by Barbara Crenshaw, Vice President and

1. Under section 4 of the bond, "[d]iscovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred."

2. "Instructions or advices" is not defined in the bond.

3. "Banking institution" is not defined in the bond.

4. Section 1(h) of the bond defines "forgery" and "forged" as "the signing of the name of another with intent to deceive; it does not include the signing of one's own nam with or without authority, in any capacity, for any purpose."

5. Section 1(o) of the bond defines "Security Agreement" as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation."

Controller of NMC, explaining that Whitman had earned a bonus of $811,500 and that $410,000 of that bonus would be paid to FSB in May 1992.

On March 6, 1992, FSB made a $450,000 personal loan to Whitman. Whitman signed a promissory note, promising to repay the loan on demand. The promissory note provided that "[t]his Note is secured by an Assignment of Bonus Payment ... executed by [Whitman] in favor of [FSB], pursuant to which [Whitman] has assigned to [FSB], as collateral security for the payment of indebtedness evidenced by this Note, a portion of a bonus due [Whitman] from National Mortgage Company ('National') payable on May 12, 1992." The Assignment of Bonus Payment was signed by Whitman, FSB, and Barbara Crenshaw for NMC. The Assignment of Bonus Payment provided that Whitman had assigned $465,000 of his $811,500 annual bonus from NMC to FSB and stated that the bonus was to be received by Whitman on May 12, 1992. Paragraph 11 of the assignment provided that NMC had joined the assignment "for the sole and limited purposes of ... confirming and agreeing that it will pay the Assigned Proceeds to Assignee as provided herein." Whitman also signed a Certificate of Borrower, confirming, among other things, that his representation that he was entitled to receive an $811,500 bonus from NMC in May 1992 was true. Whitman submitted the February 14, 1992 "confidential memo" as an attachment to the Certificate of Borrower. Crenshaw did not sign this document.

Whitman subsequently defaulted on the loan. Sometime in the middle of May 1992, FSB demanded payment from Whitman and from NMC. NMC informed FSB that the signatures on the Margolin memo, the two Margolin letters, and the Crenshaw letter were forgeries and refused to pay accordingly. As it turned out, the four documents had been forged. In addition, although Crenshaw's signature on the Assignment of Bonus Payment was genuine, Whitman was not entitled to receive a bonus from NMC.[6]

On July 1, 1992, FSB filed a proof of loss with defendant, alleging coverage under the bond for the $450,000 loss suffered as a result of the nonpayment on the Whitman loan. On September 14, 1992, defendant denied coverage for the loss. On December 27, 1994, plaintiffs filed a complaint against defendant, seeking a declaratory judgment that coverage for the loss on the Whitman loan exists under the bond. Defendant filed an answer on April 14, 1995, denying that coverage exists under the bond. On September 3, 1996, the parties filed cross-motions for summary judgment.

## DISCUSSION

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Pursuant to Rule 56(e), when confronted with a properly supported motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." A genuine issue of material fact exists "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52, 106 S.Ct. at 2511.

In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*,

---

**6.** FSB subsequently sued NMC and Whitman in state court; NMC and FSB ultimately settled, with NMC paying § 300,000 to FSB. All but $27,181.38 of the settlement, however, was applied to legal fees and costs. At some point, Whitman apparently filed bankruptcy.

799 F.2d 1128, 1133 (6th Cir.1986). With cross-motions for summary judgment, each motion is examined independently.

■ Because this is a case based upon diversity jurisdiction under 28 U.S.C. § 1332, the Court must apply the substantive law of the state in which it sits (Tennessee), *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the state's choice of law provisions, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Under Tennessee's choice of law rules,

> the validity of a contract and the substantive rights of the parties to the contract are governed by the law of the state contemplated by the parties; in the absence of evidence to the contrary, the parties are presumed to have intended to contract pursuant to the laws of the state in which the contract was entered into.

*Mackey v. Judy's Foods, Inc.,* 867 F.2d 325, 328 (6th Cir.1989); *accord Ohio Cas. Ins. Co. v. Travelers Indem., Co.,* 493 S.W.2d 465, 466–67 (Tenn.1973).

■ In this case, defendant did not address the issue of which state's substantive law would govern. In their memorandum in support of their motion for summary judgment, plaintiffs stated that, "[s]ince all pertinent events took place in the state of Tennessee, Tennessee substantive law governs." This statement is correct only if one of those "pertinent" events was the parties entering into the contract in Tennessee. Because the parties have not properly addressed this issue, the Court, using Tennessee's choice of law rules, must determine which state's substantive law will apply.

The bond itself does not contain a choice of law provision and, thus, provides no guidance as to the law contemplated by the parties. Therefore, under Tennessee's choice of law rules, the parties are presumed to have intended to contract pursuant to the laws of the state in which the contract was entered into. *See Ohio Cas.,* 493 S.W.2d at 466–67. Although the parties did not specifically pro-

vide any information about where the contract was entered into, on the first page of the bond, KW Bancshares Inc.'s principal address is listed as 500 West Walnut, Rogers, Arkansas 72757. Thus, it appears that the contract was entered into in Arkansas. Accordingly, Arkansas law will govern.[7]

■ In a contract dispute, "[i]t is the duty of courts to enforce contracts as they are written and in accordance with the ordinary meaning of the language used and the overall intent and purpose of the parties." *Hancock v. Tri–State Ins.,* 43 Ark.App. 47, 858 S.W.2d 152, 154 (1993). "[W]hen a contract is ambiguous, its construction is a question of law for the court," and, in such circumstances, a court will apply the rules of construction. *Hartford Fire Ins. Co. v. Carolina Cas. Ins. Co.,* 52 Ark.App. 35, 914 S.W.2d 324, 326 (1996). "[W]hen the terms of an insurance contract are not ambiguous, [however,] it is unnecessary to resort to the rules of construction, and the policy will not be interpreted to bind the insurer to a risk which it plainly excluded and for which it was not paid." *Id.* In this case, the parties do not contend that the bond is ambiguous—it is a standard banker's blanket bond. Thus, the Court will enforce the bond in accordance with the ordinary meaning of the language used and the overall intent and purpose of the parties without resorting to the rules of construction.

■ "Under Arkansas law, a party who files suit seeking to benefit from insurance coverage generally bears the burden of proving coverage." *American Eagle Ins. Co. v. Thompson,* 85 F.3d 327, 330 (8th Cir.1996) (citing *Snow v. Travelers Ins. Co.,* 12 Ark. App. 240, 674 S.W.2d 943, 944 (1984)). Once the insured has met this burden, the burden then shifts to the insurer to prove any applicable exclusions. *Id.*

I. *Plaintiffs' Motion for Summary Judgment*

Because plaintiffs bear the burden of proving coverage, they must establish that the

---

7. This determination is significant only insofar as Arkansas' substantive contract Law differs from that of Tennessee.

loss on the Whitman loan is covered under one of the three insuring agreements specified in the bond. Plaintiffs argue that the loss on the Whitman loan is covered under Insuring Agreements (D) and (E).[8]

## A. Insuring Agreement (D)

 Plaintiffs contend that the letter dated February 21, 1992, which bore Crenshaw's forged signature ("Crenshaw letter"), meets the requirements for coverage under Insuring Agreement (D) because (1) FSB paid funds or established credit for Whitman on the faith of the letter; (2) the letter contained written instructions or advices that were directed to FSB and authorized or acknowledged payment of funds; (3) the letter purported to be signed by a banking institution, NMC; and (4) the letter bore a forged signature. While it is undisputed that the Crenshaw letter was forged, defendant argues that plaintiffs have not established that the loss on the Whitman loan is covered under Insuring Agreement (D). Specifically, defendant contends that plaintiffs have not established the following: (1) that the Crenshaw letter represents "instructions or advices" directed to FSB, (2) that NMC is a banking institution, (3) that FSB made the Whitman loan on the faith of the Crenshaw letter, and (4) that plaintiffs' loss resulted directly from having made the loan on the faith of the Crenshaw letter. As such, defendant argues that plaintiffs' motion for summary judgment should be denied.

Although "instructions or advices" is not defined in the bond, Webster's New World Dictionary 315 (2d ed.1984) defines "instruction" as "orders or directions." "Advice" is defined as "opinion given as to what to do; counsel" and also as "information." *Id.* at 10. The Crenshaw letter provided:

> Gentlemen: At Mr. Whitman's request, I am pleased to advise you that an internal memo from our board chairman has confirmed that the amount of his bonus earned for the past year to be *$811.500.00.* In connection with the above, I am pleased

to confirm that $410,000.00 of the above earnings will be paid directly to you on the second Monday in May. We are doing this for several owners of our company to assist them in their banking needs so that they may use this assignment of wages earned as collateral.

In the letter, NMC is neither ordering or directing FSB to do anything nor counseling or giving an opinion as to what FSB should do. In fact, the letter does not even refer to a specific loan transaction. The letter merely "confirms" that Whitman was to receive a bonus and that a portion of that bonus would be paid to FSB.

While the letter does contain "information," Insuring Agreement (D) "deals principally with cases resulting from forgery of commercial paper of the nature of checks or drafts." *Liberty Nat'l Bank & Trust Co. of Louisville v. National Sur. Corp.,* 330 F.2d 697, 699 (6th Cir.1964); *see also Black's Law Dictionary* 54 (6th ed.1990) (noting that "advice" is "[t]he instruction usually given by one merchant or banker to another by letter, informing him of shipments made to him, or of bills or drafts drawn on him, with particulars of date, or sight, the sum, and the payee. Bills presented for acceptance or payment are frequently dishonored for *want of advice."*) (emphasis in original). Here, the Crenshaw letter was not commercial paper, such as a check or draft. It is clear, therefore, that the Crenshaw letter is not the type of document contemplated to be an "instruction or advice." *See National Sur.,* 330 F.2d at 699. Because the Crenshaw letter cannot be construed as written instructions or advices, plaintiffs have not carried their burden of establishing coverage under Insuring Agreement (D).

In addition to the foregoing, plaintiffs have not established that NMC is a banking institution.[9] Although "banking institution" is not defined in the bond, plaintiffs argue that NMC is a banking institution because NMC handles mortgage loans and, thus, "falls under the umbrella of Title 45 of the Tennessee

---

**8.** Insuring Agreement (A), which relates to "loss resulting directly from dishonest or fraudulent acts of an Employee," is in inapplicable in this proceeding.

**9.** Plaintiffs admitted that NMC was not a customer of FSB.

Code Annotated" and is regulated by Tennessee's Commissioner of Financial Institutions. Defendant contends that, because NMC does not accept deposits or carry on the business of a banking institution, NMC is not a banking institution.

In Tennessee, "Banking institution" is defined as "any institution organized under this title, or under title 12, chapter 2 of the United States Code [national banks]." Tenn. Code Ann. § 45–2–107(a)(1)(C). "Bank" is defined as "any company that accepts deposits in Tennessee that are eligible for insurance under the provisions of the Federal Deposit Insurance Act." *Id.* § 45–2–107(a)(1)(A). Chapter 13 of Title 45 of the Tennessee Code Annotated is the "Tennessee Residential Lending, Brokerage and Servicing Act of 1988." Tenn.Code Ann. § 45–13–101. Section 103(a) of the Act provides:

> On and after January 1, 1989, no person shall engage in the business of making mortgage loans, nor shall any person engage in the business of being a mortgage loan broker in this state, nor shall any person engage in the business of being a mortgage loan servicer in this state, without first obtaining a license from the commissioner or filing a registration under this chapter.

Tenn.Code Ann. § 45–13–103(a). The remainder of Chapter 13 relates to additional requirements for licensees under the chapter. Tenn.Code Ann. § 45–13–101 *et seq.* Section 103(b), however, provides that "[t]he requirement imposed by [§ 103(a)], and the provisions of this chapter, do not apply to any banking institution." *Id.* § 103(b). Thus, the fact that NMC falls under the umbrella of Title 45, Chapter 13 of the Tennessee Code Annotated is not dispositive. In addition, plaintiff has not submitted any additional evidence to indicate that NMC meets the definition of a banking institution. In fact, NMC's Certificate of Incorporation and its annual reports state only that it is in the business of real estate mortgage loans. Thus, plaintiff has not demonstrated that NMC is a banking institution and, therefore, has not carried its burden of proving coverage under Insuring Agreement (D).

**B. Insuring Agreement (E)**

Plaintiffs contend that the Crenshaw letter meets the requirements for coverage under Insuring Agreement (E) because the letter was an original security agreement which bore a forged signature. In addition, plaintiffs argue that the Certificate of Borrower is also an original security agreement which bore a forged signature. Although the certificate itself does not bear a forged signature, plaintiffs reason that, because the Margolin memo submitted as an attachment to the certificate was forged, the certificate bears a forged signature.

While it is undisputed that the Crenshaw letter was forged, defendant argues that plaintiffs have not established coverage under Insuring Agreement (E) because plaintiffs have not shown that their loss resulted "directly from" having made the Whitman loan on the faith of the Crenshaw letter. Specifically, defendant contends that plaintiffs' loss resulted from intrinsic fraud—Whitman was simply not entitled to receive a bonus from NMC. As such, defendant asserts that, even if Crenshaw's signature on the February 21, 1992 letter had been genuine, plaintiffs' loss would have occurred nonetheless. The Court agrees with defendant.

In *Liberty National Bank v. Aetna Life & Casualty Co.*, 568 F.Supp. 860 (D.N.J.1983), the plaintiff bank made two loans—one to Edward Vaughn and one to Vaughn's mother. As security for the loans, Vaughn gave the bank two certificates of deposit ("CDs") purportedly issued by National Bank of Commerce, Ltd. Vaughn and his mother subsequently defaulted on the loans, and the CD's proved to be worthless. The bank submitted a proof of loss to its insurer, seeking coverage for the loss under a banker's blanket bond. The insurer denied coverage, and the bank subsequently filed suit against the insurer.

The court granted partial summary judgment to the insurer, concluding that there was no coverage under two of the insuring agreements in the bond, including insuring agreement E, which was nearly identical to Insuring Agreement (E) in this case. *Id.* at 862–63. The court reasoned that the bank's loss

was not caused by the lack of authenticity or genuineness of the documents. On the contrary, the loss was caused by the fact that the statements contained in the documents were not true. The assets represented thereby did not exist. If the documents were authentic and their signatures genuine and authorized, the loss nonetheless would have occurred. The failure of the security was not because they were counterfeit or forged, but solely because the assets purportedly represented thereby were nonexistent. This loss falls upon the Bank and not the bonding company by the terms and intent of the bond.

*Id.* at 863; *accord French Am. Banking Corp. v. Flota Mercante Grancolombiana,* 752 F.Supp. 83, 91 (*S.D.N.Y.*1990) (finding that bank's loss, stemming from false bills of lading accepted by the bank as security for extending a line of credit to a customer, was not covered under a blanket bond because, "[e]ven if the signatures had been identifiable and genuine, the bills still represented nonexistent or previously completed transactions and (the bank) would have still suffered losses identical to those they now face.") (citing *Reliance Ins. Co. v. Capital Bancshares. Inc./Capital Bank,* 685 F.Supp. 148 (N.D.Tex.1988), *aff'd,* 912 F.2d 756 (5th Cir. 1990)), *aff'd,* 925 F.2d 603 (2d Cir.1991); *cf. Jefferson Bank v. Progressive Cas., Ins., Co.,* 965 F.2d 1274, 1283 n. 16 (3d Cir.1992) (distinguishing the case before it from the cases cited above because, had the notary's signature on the mortgage been valid and had mortgage been recorded, the bank "would have had valuable security").

 In this case, plaintiffs loss did not result directly from having made the Whitman loan on the faith of the Crenshaw letter. Here, as in *Liberty National* and *French American Banking,* plaintiffs' loss was caused by the fact that the statements contained in the Crenshaw letter were not true—Whitman was not entitled to an annual bonus of $811,500 from NMC. Even if Crenshaw's signature on the February 21, 1992 letter had been genuine, plaintiffs' loss would have occurred nonetheless because the alleged security, the Crenshaw letter, was worthless. It was worthless not because it was forged, but because Whitman was not

entitled to a bonus from NMC. Plaintiffs' loss, therefore, did not result directly from having made the Whitman loan on the faith of the Crenshaw letter. *See Liberty Nat'l,* 568 F.Supp. at 863; *French Am. Banking,* 752 F.Supp. at 91. The basis for this conclusion is best illustrated by examining what happened to plaintiffs even after they had Crenshaw's genuine signature on the Assignment of Bonus Payment—FSB still suffered a loss on the Whitman loan. They did so because the assignment was worthless (no bonus due) and because Whitman apparently could not, and NMC would not, repay the loan. Thus, regardless of whether the signature was genuine, FSB would have suffered a loss on the Whitman loan. Because plaintiffs cannot establish that their loss resulted "directly from" having made the Whitman loan on the faith of the Crenshaw letter, plaintiffs have not carried their burden of proving coverage under Insuring Agreement (E).

This conclusion should not be unexpected given the purpose of a banker's blanket bond. In *Liberty National,* the court explained that a banker's blanket bond

> insures that the documents submitted to the bank in connection with a loan are genuine and authentic. If they are not, and a loss is caused thereby, the bonding company guarantees the loss. On the other hand, the bonding company does not guarantee the truth of said documents. If they are not truthful, and a loss results therefrom, it is not guaranteed.

568 F.Supp. at 863. "The allocation of such losses undoubtedly arises from the practicality of the situation. A bank cannot protect against counterfeit and forged documents. It can, on the other hand, investigate the assertions made therein through credit checks, appraisals, title searches, financial statements and the like." *Id.* In this case, the bond, like most standard banker's blanket bonds, excludes coverage for most losses resulting from nonpayment of a loan obtained through fraud or false pretenses unless the loss is specifically covered under one of the insuring agreements—it is clearly not a credit insurance policy. *Republic Nat'l Bank of Miami v. Fidelity & Deposit Co. of*

*Md.*, 894 F.2d 1255, 1263 (11th Cir.1990) ("[A] banker's blanket bond is not a policy of credit insurance and does not protect the bank when it simply makes a bad business deal.") (citations and quotations omitted). Unfortunately for plaintiffs, FSB simply made a bad business deal when it made the Whitman loan. As such, no coverage exists under Insuring Agreement (E).

Moreover, were this Court to determine that coverage existed in this case, it would bind defendant to a contract that it clearly did not enter into. This concern was articulated by the court in *Republic National:*

> Were we to hold that Republic could recover on a banker's blanket bond in the instant transaction, we would in effect transform the blanket bond into [a policy of credit insurance]: our decision would allow banks to rely on documents presented by a beneficiary to a letter of credit transaction not because they are worthy of such reliance, *but rather because the reliability of such documents is insured.* At the least, such a holding would encourage sloppy banking practices ..., for if a bank can rely on the documents of title presented by the beneficiary of a letter of credit, why should it bother to investigate thoroughly the credit worthiness of its customer?

894 F.2d at 1264 (emphasis in original). As in *Republic National,* if this Court accepted plaintiffs' argument, it would transform the bond into a credit insurance policy.

Even assuming that plaintiffs could have established that their loss resulted directly from having made the Whitman loan on the faith of the Crenshaw letter, defendant argues that there is no coverage under Insuring Agreement (E) because the Crenshaw letter is not an original security agreement because the letter did not create any interest in personal property and secure any payment or performance of an obligation for FSB.[10] In *Merchants National Bank of Winona v. Transamerica Insurance Co.*, 408 N.W.2d 651 (Minn.Ct.App.1987), the court, examining a banker's blanket bond similar to that in the present case, concluded that coverage under Insuring Agreement (E) "necessarily refers only to documents that have real value to the insured bank in the event of the borrower's default." *Id.* at 654.

In this case, plaintiffs have not explained how the Crenshaw letter is an enforceable security agreement or how it could even be reasonably construed as such. In fact, the letter did not have any real value to FSB, which explains why FSB had Whitman and NMC sign the Assignment of Bonus Payment. It was this assignment, which did not bear any forged signatures, that created an interest in Whitman's alleged bonus in favor of FSB. Consequently, plaintiffs cannot seriously contend that the Crenshaw letter is an original security agreement, i.e., that the letter was "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." In addition, the Certificate of Borrower cannot be construed as a security agreement. In the Certificate of Borrower, Whitman merely confirmed the representations made in the forged documents and in the Assignment of Bonus Payment. Thus, because plaintiffs have not established that the Crenshaw letter was a security agreement, plaintiffs have not carried their burden of establishing that coverage for their loss exists under Insuring Agreement (E).

In sum, plaintiffs have not established that the Crenshaw letter meets the requirements for coverage under Insuring Agreements (D) or (E) and, thus, have not carried their burden. Because plaintiffs have not carried their burden of establishing coverage, plaintiffs have not demonstrated that they are entitled to prevail as a matter of law. Accordingly, plaintiffs' motion for summary judgment is DENIED.

## II. *Defendant's Motion for Summary Judgment*

Defendant argues that its motion for summary judgment should be granted because plaintiffs cannot establish that coverage exists for the loss on the Whitman loan. As discussed above, plaintiffs have failed to car-

---

**10.** Defendant also argues that, because the Crenshaw Letter was sent to FSB via facsimile, the Letter is not an "original." Because there are other dispositive issues, the Court declines to reach this argument.

ry their burden of establishing that coverage exists under the bond for the loss on the Whitman loan. Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Even reading all of the evidence in a light most favorable to plaintiffs, it is clear that plaintiffs cannot establish their right to recover under the bond. Accordingly, defendant's motion for summary judgment is GRANTED.

### *CONCLUSION*

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED, and defendant's motion for summary judgment is GRANTED.